**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-721-CKK** |
| | : | |
| | : | |
| **HOWARD CHARLES RICHARDSON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR BAIL**

Howard Richardson is charged with assaulting a police officer with a metal flagpole—stopping only after the metal pole broke in his hands—during the violent and deadly attack on the U.S. Capitol on January 6, 2021.   He was captured on video from multiple angles committing this serious offense.   And in addition to the charged offense, his recent behavior in other incidents shows a troubling pattern of aggressive and harmful behavior, including one alleged assault that led to the victim's hospitalization with serious injuries.   A U.S. Magistrate Judge correctly ascertained the defendant's "propensity for violent behavior"—which was compounded by his willingness to "depict himself as a victim,"—and found it "astounding [] that anyone would even consider releasing him on house arrest."   Transcript of Detention Hearing, E.D. Pa., Dec. 3, 2021 (Exhibit 6), at 12-13.   Although the United States initially considered a joint request for release on conditions, the defendant's subsequent behavior—in particular, his lack of candor with the Pretrial Services (PTS) Officer—and additional information from local law enforcement forced the government to re-assess the risk of danger.   The magistrate judge found that there are no conditions that can reasonably assure the safety of the community in the event the defendant is

- 1 -

released, and the defendant has proffered no new facts that should disturb that decision.   The

United States respectfully requests this Court deny the defendant's Motion for Bail.   (Dock. No.

16) ("Def. Mtn").

## I.     FACTS OF THIS CASE

### A.     The Defendant's Conduct on January 6, 2021

On the morning of January 6, 2021, Richardson drove from his home in Pennsylvania to

Washington, D.C., to attend President Trump's speech at the rally at the Ellipse.   He arrived late

morning, and his cell phone battery died, making it difficult for him to meet up with the group he

planned to join.   According to Richardson, who later described the events to FBI agents, he saw

people heading toward the U.S. Capitol building in large numbers, and he decided to join them.

He saw bicycle rack-style barriers set up around the grounds, with police officers manning the

area.   Then he saw people knock over and walk past those barriers, and he followed.   He got up

to the front of the next line of police who were attempting to keep the crowd back.   He made his

way up the stairs from the West Lawn and the Lower West Plaza to the Upper West Plaza near the

Media Tower (Figures A and B).   He saw the crowd getting unruly; as Richardson reported to the

FBI, people were climbing the large scaffolding structures, throwing tear gas cannisters, and

throwing firecrackers at the police.



*Figure A (View of the area in front of the Inaugural Stage at 1:30 pm on January 6, 2021)*



*Figure B (Map of Capitol Grounds and Media Tower location)*

About half an hour after Richardson got to the Capitol grounds, according to a custodial interview with Richardson in October 2021 (prior to his arrest in this case), he said he saw a group of men try to ram the police barriers with an enormous Trump picture or sign.  He was close enough to touch it when the altercation happened.   When the police responded with what Richardson described as tear gas or pepper spray, he received a dose of the tear gas himself.  Body-Worn Camera (BWC) footage from D.C. Metropolitan Police Department (MPD) officers who were in the area shows a very large Trump sign or structure was indeed used in an effort to ram through the police line, in a video in which Richardson can be seen just a few minutes before the screenshot shown here (Figure 1).



*Figure 1*[1]

---

[1] As reflected in the time stamp embedded in the photo, Figure 1 shows a crowd using this large sign to ram the police line at approximately 1:40 pm, a few minutes after the assault with which Richardson is charged in this case.   Undersigned counsel has not located video footage or other evidence showing that use before Richardson's assault.   It is possible that more than one effort was made to ram through the police line with a large sign, but it is also possible that Richardson's description of the timing of these events was faulty.

After Richardson was pepper sprayed, he described to the FBI that another person in the crowd offered him milk for his eyes, which allowed him to recover.   He did not take this as a signal to leave, retreat, or change his behavior.   Instead, he stayed in the area; once he recovered, he went back to the front line just behind the police barricade.   BWC video shows Richardson waving a flag and standing just in front of the police.   At one point, he can be heard telling another rioter, of the MPD officers, "They're not leaving voluntarily."   A few feet away from where Richardson was standing, a scuffle broke out when rioters seemed to hit the metal barricade, leading the police to deploy pepper spray.   A woman near Richardson took cover from the pepper spray using her coat.   *See* Exhibit 1 (BWC video from MPD Officer S.N.) at 13:38:33.   Richardson, unprovoked, moved around that woman toward the police line with his flagpole raised high in the air and began using the metal pole to strike one of the officers three times (Figures 2, 3, and 4).   *Id*. at 13:38:38.   It appears from the video footage that an officer attempted to block Richardson's first strike with his baton, but Richardson continued swinging.   In fact, he did not stop until the metal flagpole broke in his hands (Figure 4).



*Figure 2*



*Figure 3*



*Figure 4*

The MPD Officer Richardson attacked, identified in the indictment at "R.N.," recalled the

events in a statement to FBI agents.[2]   Officer "R.N." lost his BWC that day due to the chaos of

the riot.   But he remembered Richardson, wielding a flagpole, and recalled being struck with a

flag pole several times.   (He could not say, due to the chaos—which is evident in the BWC video

---

[2] A redacted report of this statement was provided to the defense as part of a targeted discovery production on January 7, 2022, and designated as "Sensitive" under the Protective Order entered in this case.   The government will file a sealed copy of that report upon request of the Court.

taken by nearby officers—whether Richardson was the individual who struck him, but he did recall being struck several times.)

Police then again deployed pepper spray in Richardson's direction, and he retreated behind the first line of rioters. This was, according to Richardson's own statement, the second time during the riot, in the span of just a few minutes, that he had been temporarily incapacitated by pepper spray. Despite having tear gas deployed at him to stop his violent acts, Richardson did not leave the restricted grounds of the U.S. Capitol. He walked around to the east side of the building, where, by around 2:54 pm, video surveillance shows he was standing on the Capitol steps once again directly in front of a line of police officers working to secure the building (Figure 5). Video footage suggests that he left the grounds at about 3:10 pm (Figure 6).




*Figure 5*                                          *Figure 6*

### B.      The Defendant's Statements to the FBI

Richardson was interviewed by FBI agents on October 25, 2021, while he was in custody on unrelated assault charges stemming from an incident near his home in King of Prussia, Pennsylvania. He was read his *Miranda* rights and agreed to waive them and spoke voluntarily to the agents about the events of January 6. He said that he was motivated to go because he was "pissed off" about the election and angry about voter fraud, which he claimed to have seen first-

hand as a poll watcher.  He admitted that he walked through the broken barrier onto restricted grounds outside the Capitol.

Richardson admitted that he swung his flagpole at a police officer.   But he claimed that he only did so because the officer swung at him first.  He suggested that his assault was merely a reflex, in response to the officer's aggression.  The agents, noting a significant discrepancy, offered that perhaps he mis-remembered the event, and they offered to let him watch the video right then.  Richardson happily accepted the opportunity to watch the video.  He identified himself on the video, but even after watching the clip, he continued to insist that he was striking back to an invisible provocation.

The agents asked Richardson what he thought about his actions and behavior that day, particularly in light of the fact that Richardson's adult son is a 20-year veteran police officer. They asked how he would feel if someone treated his son the way he had treated the officer he struck.   Richardson allowed that he might not have exhibited the best behavior he could have and conceded that he might have been caught up in mob mentality.   But he was essentially unrepentant, claiming, "I don't look at someone like a police officer when he's trying to hit me."[3] He also suggested that the mob had been infiltrated by people attempting to agitate the crowd and the police, further deflecting responsibility away from himself and attempting to justify his violent behavior with claims that were demonstrably untrue.

---

[3] No transcript has been prepared of this interview, so quotes are based on notes of a review of the video-recorded meeting.

## II.   THE DEFENDANT'S RECENT VIOLENT AND EVASIVE CONDUCT

### A.   Prior Encounters with Law Enforcement

Richardson, now age 71, has no criminal convictions.   But in recent years he has displayed a troubling and escalating propensity toward violence, threats, and erratic behavior, reflected in serious criminal charges.

In July 2018, police in Philadelphia responded to a call for a person with a gun involved in a dispute with two individuals at a gas station.   Richardson and the two complainants got into an argument over where the complainant had parked, blocking the gas pumps.   During the argument, Richardson lifted his shirt to show that he was carrying a concealed firearm.   Richardson claimed to the police that he did so because he "felt threatened," but it does not appear he offered any explanation for that feeling.   Later, as the altercation continued, Richardson drew his weapon. Richardson conceded this was true; his explanation to the police was that he never pointed the firearm at either of the complainants.   *See* Exhibit 2 (Philadelphia Police Department Investigation Report, July 9, 2018).

No one was arrested as a result of this incident, but Richardson's permit to carry a concealed firearm was revoked.   A revocation letter was sent to Richardson in August 2018 explaining that his permit was revoked because he was determined to be "[a] person whose character/reputation indicates danger to public safety."   *See* Exhibit 3 (East Norriton Township Police Department supplemental report, Oct. 29, 2020, quoting 2018 letter).   Richardson hired an attorney to contest the revocation and re-instate his permit, demonstrating his knowledge of the decision to revoke.

On October 10, 2020, Richardson was pulled over for driving a car with suspended registration; during the traffic stop, police determined that Richardson's driver's license was also

suspended.   *See* Exhibit 4 (East Norriton Township PD report, Oct. 11, 2020).   The officer asked Richardson if he was carrying a firearm.   Richardson reported that he was not, and specifically added that his permit to carry was revoked because of an altercation in Philadelphia, and his firearm had been confiscated.   But later, the officer asked Richardson again if he was armed. Only then, after first lying to the officer and pretending to be unarmed, did Richardson disclose that he had a loaded, concealed weapon on his right hip—and that in fact he "always carries" a firearm.   *Id.*   This caused the officer to call for backup, remove Richardson from the car, and confiscate the weapon.   *Id.*   Richardson was issued a summons and charged with carrying firearms and driving without a license.   He was released on $5,000 unsecured bond.   That case remains pending.

Less than three months later, Richardson traveled to D.C. and participated in the January 6 riot.   Although his state charges were still pending, Richardson went to the front lines of the riot and found himself face-to-face with uniformed police officers working to protect the U.S. Capitol and the people working inside.   Even after having been tear gassed, despite his pretrial release status, Richardson returned to the rioters' front line to commit the assault charged here.

Richardson's pattern of violence has continued since the Capitol riot.   On September 23, 2021, Richardson allegedly assaulted a motorcyclist riding down his street.   The victim reported that Richardson "tackled him" off his motorcycle, causing a crash.   *See* Exhibit 5 (Upper Merion Township Police Report, dated Sept. 23, 2021), at 6.   The incident was witnessed by neighbors and captured on a surveillance camera located across the street from the event.   As the screenshots below illustrate (Figure 7), the video shows that Richardson stood in the street in what appears to be an effort to block passage by the motorcyclist.   As the motorcyclist drove by and did not yield, the video appears to show Richardson knock the rider off the motorcycle.



*Figure 7*

The victim rider can be heard in the surveillance footage screaming out in pain.   He was taken to the emergency room and treated for significant injuries including stitches to his eyebrow area, ligament damage to his fingers, and surgery for a "chunk taken out of his right leg."   *Id.* at 7.   About five minutes later, the victim's brother came to assist, carrying a metal pipe or spike. He claimed Richardson "brandished a firearm" and so he dropped the pipe.   A neighbor who witnessed the aftermath of the incident said he saw Richardson go to his truck, which was parked right near the site of the crash, and pull out a 7-inch knife which he displayed to the brother.

After the incident, Richardson spoke to the police; his account was significantly different from the victim's and the neighbor's.   Richardson claimed he had been trying to slow down the motorcyclist and that the rider clipped him as he (Richardson) attempted to get out of the way. He also denied brandishing any weapon, including a firearm or a knife, during the incident.   *Id.* at 6.   The video does not reflect any effort by Richardson to get out of the way; instead, he appears to lean into the rider's path.   In short, Richardson once again deflected responsibility for his actions onto others, offering excuses for his violent behavior.

Richardson was charged with aggravated assault and other crimes relating to this incident. He was arrested on October 25, 2021.   Officers arrived at Richardson's house, told him that he

was under arrest, placed him in handcuffs, and brought him in the back of a police car to the Upper Merion Township police station.   There, he was read his Miranda rights.   He remained in police custody until he made his first court appearance and was eventually released on conditions and $5,000 unsecured bail.   Those charges also remain pending.

### B.      Attempted Arrest and Subsequent Self-Surrender

Federal agents obtained a warrant for Richardson's arrest in this case and made plans to execute the arrest on Monday, November 29, 2021.   But that morning, they learned that Richardson had gone away for the weekend and not yet returned.   Agents contacted Mr. Thomas Egan, who represented Richardson on the state assault charges, to inform him of the pending warrant.   Mr. Egan spoke with the AUSA in the Eastern District of Pennsylvania who would handle the initial appearance, and it was agreed that Richardson could self-surrender to the FBI the following morning in lieu of being arrested at his home or elsewhere.   Government counsel did not promise any concessions as to Richardson's release or bail conditions in exchange for his agreement to surrender; instead, the defendant's surrender was a courtesy offered to allow him some control over the timing of his arrest.

Separate and apart from the offer to allow for self-surrender, the United States initially determined—before Richardson's interview with PTS, before government counsel had learned the details of Richardson's suspended concealed carry permit, and before PTS had made its evaluation and recommendation as to the suitability of release—that it would recommend the defendant be released on certain specified conditions.   Government counsel conveyed its preliminary decision and proposed conditions to defense counsel in advance of Richardson's surrender and interview. Counsel indicated that he would not object.

### C.       Richardson's Lack of Candor with PTS

However, the suitability of the defendant's release was repudiated by new information. Richardson's pattern of lying to law enforcement, demonstrated in the incidents described above, continued even to officers of the Court.   On November 30, 2021, after surrendering to the FBI, Richardson was interviewed by a federal Pretrial Services (PTS) officer in preparation for his initial appearance in the Eastern District of Pennsylvania.   The officer asked whether Richardson had ever been arrested.   Richardson falsely reported that he had not, and falsely claimed he had no open cases.   The officer, an experienced interviewer, clarified by asking the same question even if he had never been convicted; Richardson still said he had never been arrested.   This officer, who spoke with the FBI and the undersigned in preparation for this Response, recalled that Richardson provided false answers; it was her impression that Richardson was not simply confused or mistaken.[4]   Richardson's lies during that interview were among the factors that contributed to the PTS recommendation of detention.

Also of concern, Richardson refused to discuss with the PTS officer his access to firearms. Prior to his surrender, the FBI had researched the defendant's access to firearms, but that information was at least partially incomplete.   The day of Richardson's arrest for the motorcycle assault, in October 2021, federal agents executed a search warrant at his home relating to the January 6 assault.   Prior to the search, they conducted a records check for known firearms; they found just one result indicating that the homeowner, believed to be Richardson's girlfriend,

---

[4] The PTS officer spoke with the FBI and undersigned counsel on January 19, 2022, and provided a blank copy of the form PTS uses to document the questions and answers given by defendants during the initial interviews.   The form indicates that defendants are asked about arrests, offenses charged, and bail, as well as any disposition or the next court date.   The completed form used for Richardson's interview has not been provided to the government, but it is believed to be in the files of PTS.   The United States will seek to obtain that form or have the PTS officer address this Court directly upon request.

purchased a Smith & Wesson pistol in August 2013.   During the search, however, agents located a second weapon, a Ruger pistol, for which they could locate no records of sale.   The homeowner told agents, according to an FBI report of the search, "it was a recent purchase."   The report does not clarify whether the homeowner reported that the Ruger was hers or the defendant's, and it does not appear that database records provide any answer.   Thus, the defendant's refusal to answer PTS's questions about his ownership of and access to firearms was particularly concerning, and the information provided to PTS by the defendant's girlfriend has not been verified by independent sources.[5]

After learning this troubling additional information, the United States was compelled to revisit its assessment of the defendant's danger to the community.   In doing so, investigators sought additional information, and first received the report about the defendant's threatening display of a firearm during the gas station altercation (attached as Exhibit 2), as well as video of the defendant's alleged assault on the motorcyclist (set forth in still shots above).   His violent tendencies became more apparent, as did his unwillingness to accept his own responsibility and role in escalating these dangerous events.   The false and incomplete answers the defendant reported to PTS highlight his unsettling willingness to deny even facts that can be easily ascertained.   As noted above, the magistrate judge reviewing the defendant's detention, after learning that the government had considered recommending release with conditions, found:

---

[5] The defendant's current claim that he refused to answer because he "was concerned that he was infringing on his girlfriend's right to possess firearms[,]" Def. Mtn. at 4, is confounding. If the defendant were accurately reporting that the only two firearms he has access to are both lawfully owned by his girlfriend, id., and that he is authorized to agree to their surrender as he suggests, id. at 3, he would have no reason for concern.   On the other hand, it is also possible that the defendant refused to answer because he was hesitant to disclose his access to other firearms that are currently unknown to federal agents.   As his 2020 traffic stop suggests, he is willing to lie to law enforcement about his possession of firearms—even when a loaded gun was hidden at his hip.

[I]t's astounding to me that anyone would even consider releasing him on house arrest, given his propensity for violent behavior stemming from the gas station incident, the assault on the motorcycle operator, and his attack on Capitol police officers, which is one of the most blatant acts of violence I've seen in recent memory.   And then to depict himself as a victim, that the police were assaulting him when he was disrupting a session of the United States Congress, is the ultimate act of violence in my view.

Exh. 6, at 13.

## III.   LEGAL AUTHORITY AND STANDARD OF REVIEW

Richardson has been indicted for, among other charges, assaulting a federal law enforcement officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(b), which is a crime of violence that allows for a request of detention under the Bail Reform Act.   18 U.S.C. § 3142(f)(1).   After reviewing evidence and argument, U.S. Magistrate Judge Timothy R. Rice, in the Eastern District of Pennsylvania, found that the defendant's "recent history of escalating violent behavior[,]" his "recent pattern of lying to law enforcement officers about his behavior[,]" and his "history of failing to abide by requirements restricting his possession and use of firearms[]" demonstrated his danger to the community and the need for detention.   Pretrial Detention Order (Exhibit 7), at 2.

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment of the order" with "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b).   Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to de novo review.   *See United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017).

## IV.   STATUTORY CONSIDERATIONS

Section § 3142(g) sets out the factors that the Court must consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the

offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.   *See* 18 U.S.C. §3142(g).   Considering all these factors, the magistrate judge correctly determined that there are no conditions or combinations of conditions which can reasonably assure the safety of the community if Richardson is released.   His detention is required.

        (1)    <u>Nature and Circumstances of the Offense</u>

This crime of violence took place during one of the most serious and impactful offenses in the country's history.   18 U.S.C. § 3142(g)(1).   During the January 6 siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals with weapons, bulletproof vests, and bear spray who were targeting the law enforcement officers protecting the Capitol.   The violent crowd outside encouraged others in the crowd to work together to overwhelm law enforcement and gain unlawful entry into the U.S. Capitol.   Richardson was a part of this very mob and his violence early in the day contributed to the crowd's ability to overcome the police.

By his own admission, Richardson stood by as a group of protestors used a Trump sign as a battering ram against a line of officers struggling to protect the barricades.   Those officers deployed pepper spray on Richardson and the others in the crowd in an effort to stop that attack and to deter them from approaching again.   Also by his own admission, Richardson was undeterred by this effort by the police to prevent him from committing violence.   Even after succumbing to tear gas, Richardson, with help from other rioters, re-grouped and recovered.   He went back to the front line and stood his ground at the barricade.   He told other protestors that the police would not leave voluntarily, then spontaneously began his own violent effort to beat the

police line.   And he was at the event because, as he admitted to the FBI, he was angry about the results of the election.   This factor strongly weighs in favor of detention, even when compared to other defendants charged with offenses relating to the January 6 riot.   *See United States v. Chrestman*, 525 F. Supp. 3d 14, 27 (D.D.C. Feb. 26, 2021) (Howell, C.J.) ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement," because this demonstrates "the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community."); *see also United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021) ("[T]hose who actually assaulted police officers…are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way.").

Richardson faces steep consequences for this dangerous and serious conduct.   He is charged with assaulting law enforcement using a deadly or dangerous weapon, and with obstructing law enforcement from performing their duties during a civil disorder.   These felonies carry statutory maximum penalties of twenty and five years in custody, respectively.   And the advisory U.S. Sentencing Guidelines suggests the very real possibility he will be sentenced to a lengthy period of incarceration upon conviction.   *See* U.S.S.G. §2A2.2.   Moreover, Richardson committed this offense while he was on pre-trial release in his October 2020 case; that court's order to comply with the law clearly did not deter his violent behavior here.   In short, the nature and circumstances of the charged offenses weighs in favor of detention.

(2)     Weight of the Evidence

- 17 -

The evidence against Richardson is overwhelming.   18 U.S.C. § 3142(g)(2).   He is on video from multiple angles attacking—unprovoked—an officer engaged in a crucial law enforcement duty, protecting the United States Capitol from attack, until the metal pole in his hand breaks.   Richardson admitted that he struck the officer with a metal pole, and his claim that he only reacted on "reflex" to being struck first is belied by the video evidence.

    (3)    <u>History and Characteristics of the Defendant</u>

Richardson's history and characteristics, including his recent violent, threatening, and erratic conduct and his pattern of minimizing and lying about his own misconduct, demonstrate his danger to the community.   18 U.S.C. § 3142(g)(3).

Richardson's violent acts have escalated in recent years.   He threatened two people with a gun after a disagreement over their parking job.   He sent a young man to the hospital after determining the victim was riding his motorcycle too fast down the street, while he was on pretrial release for an unrelated firearms offense.   He continued to unlawfully carry a loaded and concealed firearm after his license to carry was revoked.   As his false explanations to the FBI in this case exemplify, Richardson takes no responsibility for his role in escalating these situations into violence.   He repeatedly maintains that he was the victim and others were the aggressors in each situation.   This suggests that he has no ability to avoid more serious violent incidents in the future or conform his conduct to the strictures of pretrial release.

Even in this very Motion for Bail, Richardson continues to deflect, avoid responsibility, and minimize the consequences of his actions.   He asserts that he swung his "ordinary" flagpole and hit "the metal barrier."   Def. Mtn. at 2, para. 4.   He claims that it appears no officer was struck.   *Id.*, para. 5.   He asserts that no officer was injured.   *Id.*, para. 6.   These claims are contrary to the video recording of the assault, and contrary to the recollection of the victim "R.N.,"

who recalled being struck by the flagpole several times.   Even in the face of clear contrary evidence, once again even now Richardson refuses to concede responsibility or acknowledge that his actions caused harm.

Richardson not only minimizes and deflects his own behavior—he also has shown a willingness to lie outright.   When Richardson lied to a police officer about carrying a loaded weapon during his 2020 traffic stop, he displayed a dangerous disregard for the officer's safety, and for the gravity of a high-stakes situation he made much more likely to escalate into possible tragedy.   In this case, Richardson lied to the FBI, claiming he had been provoked before striking the officer he assaulted on January 6.   And he lied to a representative of the Court, claiming that he had never been arrested and that he had no pending criminal cases.   He may have believed that answer would increase his esteem in the eyes of the Court, and lead to a more favorable result at his detention hearing.

Finally, the fact that Richardson committed this offense on January 6 just a few months after proceedings commenced in his October 2020 charges, and while he was on release pending trial in that case, further weighs in favor of the need for detention.   18 U.S.C. § 3142(g)(3)(B).

Richardson points to his physical and mental condition (his age and lack of any diagnosed mental illness), employment and financial resources[6] (owning a small business) family ties (his longtime live-in girlfriend), length of residence in the community (lifelong resident of the state),

---

[6] Richardson argues that his continued incarceration will take a toll on his finances.   While this collateral consequence is regrettable, it does not address the statutory factors this Court must consider in determining detention, and does not mitigate the concern for the safety of the community.   Moreover, it is undermined by his refusal to detail his financial situation in his PTS interview.   Although Richardson conceded he has other forms of income—in particular, rental income—he would not provide details about the amount of that income he receives.   His unsupported claim now that this is "the most important source of income" for his retirement, Def. Mtn. at 5, could be considered with some skepticism.

and history relating to drug or alcohol abuse (a lack of any "addiction issues").   Def. Mtn. at 5.
He suggests that these facts, and his self-surrender in this case—which he agreed to only after
learning that his arrest was imminent—weighs in favor of his release.   While these facts may
mitigate the defendant's risk of flight, they do not address the serious threat that Richardson poses
to the community, an independent basis for detention here.   *United States v. Salerno*, 481 U.S.
739, 755 (1987) (noting that even if the defendant does not pose a flight risk, danger to the
community alone is sufficient reason to order pretrial detention).   This factor weighs strongly in
favor of detention.

       (4)    <u>Nature and Seriousness of the Danger</u>

       The nature of the danger to the community that would be posed by Richardson's release is
severe.   Among the most troubling aspects of his behavior is his illegal and irresponsible gun
ownership and use.   He carries concealed weapons when he knows that is prohibited precisely
because the authorities determined he posed a danger to public safety.   That determination was
made three years ago, and in the intervening time evidence shows he has unlawfully carried a
loaded firearm (and told the police that he "always" does), attacked a uniformed police officer with
a dangerous weapon, and sent a young man to the hospital with significant injuries.   Richardson
also lied to the police about his gun possession, seriously jeopardizing the safety of the officer who
conducted that 2020 traffic stop.   And he refused to tell the PTO in this case about his access to
weapons, perhaps hoping that would allow him to evade trouble.   But even if all his firearms were
safely surrendered as a condition of release here, that could not abate the risk of danger he poses.
He admitted to a police officer that he always carries a weapon—even after his permit was revoked.
Richardson's two pending assault cases involved no firearms whatsoever—he used a metal pole

in one and simply his hands in another (while eyewitnesses recalled that he subsequently brandished a firearm or a knife).   The risk of danger upon Richardson's release is real and serious.

**IV.**     **CONCLUSION**

The evidence is clear and convincing that no condition or combination of conditions will reasonably assure the safety of the community if the defendant were released pending trial.   The government respectfully requests that the defendant's Motion for Bail (Doc. 16) be denied.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney
DC Bar 481052


 /s/ *Emily W. Allen*
EMILY W. ALLEN
Assistant United States Attorney
CA Bar No. 234961
Assistant U.S. Attorney
District of Columbia
Capitol Riot Detailee
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 907-271-4724
Email: Emily.allen@usdoj.gov