**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-721-CKK** |
| **HOWARD CHARLES RICHARDSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Howard Richardson to forty-six months' incarceration, the high-end of the sentencing guideline range as calculated by the parties in the plea agreement, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.    INTRODUCTION

Howard Richardson participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

Richardson joined the storming of the police line on the West Terrace just in front of the

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

media tower that had been constructed ahead of the Presidential Inauguration. He brought a metal flagpole with him to the Capitol that day. At around 1:38 p.m., as he stood at the very front of the line of police officers struggling to maintain their position and hold the mob back, Richardson used his metal pole to strike a police officer three times, stopping only when the metal pole broke in his hands. Then, moments later, he helped a group of rioters force a very large metal billboard into the same line of besieged officers. Although he was pepper sprayed at least two times in short order, Richardson remained on the Capitol grounds until around 3:10 p.m. Since that day, in interviews with federal agents and statements to this Court, Richardson has struggled to acknowledge his contributions to the violent attack and the serious impact his actions had on the law enforcement officers present that day.

The government recommends that the Court sentence Richardson to 46 months' incarceration, the high end of the agreed-upon advisory Guidelines range of 37-46 months. A 46-month sentence reflects the gravity of Richardson's conduct and his failure to show any signs of regret, while also accounting for his early acceptance of responsibility and guilty plea.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Richardson among them, unlawfully broke onto the restricted U.S. Capitol grounds in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and those who gained access to the Capitol Building itself ransacked the historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who

breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Richardson's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 11-17.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration

Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/ imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/ AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.7 million.

**B.      Richardson's Role in the January 6, 2021 Attack on the Capitol**

On the morning of January 6, 2021, Richardson drove from his home in Pennsylvania to Washington, D.C., to attend President Trump's speech at the rally at the Ellipse. He arrived late morning, and his cell phone battery died, so he did not meet the group he planned to join. According to Richardson, who later described the events to FBI agents, he saw people heading toward the U.S. Capitol building in large numbers, and he decided to join them. He saw bike rack barriers set up around the grounds, with police officers manning the area. Then he saw people knock over and walk past those barriers, and he followed. He got up to the front of the next line of police who were attempting to keep the crowd back. He made his way up the stairs from the West Lawn and the Lower West Plaza to the Upper West Plaza near the Media Tower (Figures A and B). He saw the crowd getting unruly; as Richardson reported to the FBI, people were climbing the large scaffolding structures, throwing tear gas cannisters, and throwing firecrackers at the police.



*Figure A (View of the Media Tower and area in front of the Inaugural Stage at 1:30 p.m. on January 6, 2021)*



*Figure B (Map of Capitol Grounds and Media Tower location)*

At around 1:38 p.m.—about half an hour after Richardson got to the Capitol grounds, according

to a custodial interview with Richardson in October 2021 (prior to his arrest in this case)—police

body-worn camera (BWC) video shows Richardson waving a flag and standing just in front of the

police.   At one point, he can be heard telling another rioter, of the Washington D.C. Metropolitan

Police (MPD) officers, "They're not leaving voluntarily." *See* Exhibit 1 (BWC video from MPD

Officer S.N.) at 13:38:00 p.m. A few feet away from where Richardson was standing, a scuffle

broke out when rioters seemed to hit a metal barricade, leading the police to deploy pepper spray.

A woman near Richardson took cover from the pepper spray using her coat. *Id.* at 13:38:33 p.m.

Richardson, unprovoked, moved around that woman toward the police line with his flagpole raised

high in the air and began using the metal pole to strike one of the officers three times (Figures 1, 2, and 3).  *Id.* at 13:38:38. It appears from the video footage that an officer attempted to block Richardson's first strike with his baton, but Richardson continued swinging.   In fact, he did not stop until the metal flagpole broke in his hands (Figure 3).



*Figure 1 (Excerpt from video Exhibit 1)*



*Figure 2 (Excerpt from video Exhibit 1)*



*Figure 3 (Excerpt from video Exhibit 1)*

The MPD Officer Richardson attacked, identified in the indictment as "R.N.," recalled the events in a statement to FBI agents. Officer "R.N." lost his BWC that day due to the chaos of the riot. But he remembered Richardson, wielding a flagpole, and recalled being struck with a flagpole several times. He could not say, due to the chaos—which is evident in the BWC video taken by nearby officers—whether Richardson was the individual who struck him, but he did recall being struck several times. The BWC video establishes—and Richardson has admitted, *see* ECF 28 (Statement of Offense) at ¶¶ 10, 12—that he struck the officer three times.

Police then again deployed pepper spray in Richardson's direction, and video shows that Richardson felt the effects of the chemical deterrent in his eyes. He retreated to the media tower, where he found assistance from other rioters and wiped his eyes (Figure 4).



*Figure 4 (Excerpt from video Exhibit 1)*

But Richardson's momentary retreat did not bring his assault on the police to an end. Video evidence first identified by the government after Richardson's change of plea hearing shows that less than two minutes after he retreated, Richardson stood up at attention when the crowd responded to a new development. A large billboard encased inside what appears to be a steel frame had been hoisted by the crowd and was being propelled toward the same line of police Richardson had just assaulted. *See* Exh. 1 at 13:40:11 p.m. The all-metal sign frame was approximately eight feet tall and 10 feet wide, welded with screws, and supported by large casters that were approximately the size of a man's head. Images and videos found online of the event help to show the full scale of the enormous sign (Figures 7, 8, and 9).

Police officers shouted to one another to protect themselves from this large and dangerous moving object. *Id.* at 13:40:11 p.m. Richardson pulled himself together and pressed his way *toward* the billboard, attempting to place his hands on it (Figure 5). When he reached it, he grabbed and shoved it, with the help of other rioters, directly toward the police. Video footage shows

Richardson and his cohorts using the sign as a battering ram to try to break through the movable bike rack barrier. *Id*. at 13:40:25 p.m.   In fact, the effort was somewhat successful; video from body-worn camera of a nearby officer shows that the rioters broke through the bike rack barrier and created a gaping hole in the police line, along with considerable chaos to the officers (Figure 6). *See* Exhibit 10 (BWC from MPD Officer J.C.).



*Figure 5 (Excerpt from video Exhibit 1)*



*Figure 6 (Excerpt from video Exhibit 10)*

Another video, located on Youtube, shows Richardson's eagerness to help the crowd and assist with the push of this massive battering ram. Richardson approached the group when the sign was hoisted, placing himself right at the front of the line to help yank the structure toward the police. *See* Exhibit 2 (available at https://www.youtube.com/watch?v=IBUOVQmE5GQ&t=289, beginning at approximately 4:40 minutes). Photos posted to Instagram similarly show the scene. (Figures 8, 9.) As described by USCP Officer N.S., who was part of the defensive line, the sign frame was heavy and very sturdy and, in part due to the relatively sharp edges of the metal frame, could have "split someone's head open." Officers such as N.S. and others not wearing a helmet who were near or came in contact with the sign frame were particularly vulnerable to serious injury or worse.



*Figure 7 (Excerpt from video Exhibit 2)*



*Figure 8 (image of Richardson helping to hoist the Trump billboard, located on Instagram)*



*Figure 9 (image of Richardson shoving the billboard toward police, located on Instagram)*

Fortunately, police officers at the scene succeeded in wresting the billboard from the rioters and moving it out of their further reach. From video footage, it appears that Richardson was dosed with pepper spray yet again, and he ducked and shielded his eyes. This time, he stayed put, and again used the media tower and surrounding scaffolding as a safe haven to compose himself and wipe off the chemical spray (Figure 10). Richardson stayed in place as the crowd filled into the area, until around 1:59 p.m., when body-worn camera footage shows him leaving the shelter of the tower and heading north.



*Figure 10 (Excerpt from video Exhibit 1)*

The officers who were assaulted with the sign frame and other officers at the Capitol's West Front had defended their lines for over an hour from various confrontations and attacks by the mob. The hundreds of officers on the West Front were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.

By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were no longer manned defenses between the crowd and several

entrances into the Capitol, allowing the stream of rioters that had started entering the building

around 2:13 p.m. to build to a torrent, as depicted in the photos, below:





*Breakthroughs in the defensive line (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

The government has been unable to determine Richardson's exact location during this time

but it is clear that his actions contributed to the breach of the police line that led directly to the

storming of the Capitol doors. The officers were simply worn down and unable to maintain their position against the violent mob. And despite being hit with multiple doses of tear gas, Richardson remained in the restricted area participating in the riot. By around 2:54 p.m., video surveillance footage shows that Richardson had walked around to the east side of the building, where he stood on the Capitol steps once again directly in front of a line of police officers working to secure the building (Figure 11). Video footage suggests that he left the grounds at about 3:10 p.m. (Figure 12).



*Figure 11*



*Figure 12*

### C.  Richardson's Statements to the FBI

Richardson was interviewed by FBI agents on October 25, 2021, while he was in custody on unrelated assault charges stemming from an incident near his home in King of Prussia, Pennsylvania. *See* Exhibit 3 (video recording of Richardson interview with FBI); Exhibit 4 (transcript of Richardson interview). After agreeing to waive his *Miranda* rights, Richardson spoke voluntarily to the agents about the events of January 6. He said that he was motivated to go because he was "pissed off" about the election and angry about voter fraud, which he claimed to have seen first-hand as a poll watcher. Exh. 4, page 11, line 11 (hereinafter, "11:11"). He admitted that he walked through the broken barrier onto restricted grounds outside the Capitol.

Richardson admitted that he swung his flagpole at a police officer. But he falsely claimed that he only did so because the officer swung at him first. Exh. 3 at 16:30:22 p.m. He suggested that his assault was merely a reflex, in response to the officer's aggression. *Id*. at 16:33:10 p.m. The agents, noting a significant discrepancy, offered that perhaps he mis-remembered the event, and they offered to let him watch the video right then. *Id*. at 16:34:55 p.m. Richardson accepted that offer (Figure 13). *Id*. at 16:36:10 p.m. He identified himself on the video, but even after watching the clip twice, he continued to insist that he was striking back to an invisible provocation. *Id*. at 16:37:10 p.m., 16:44:10 p.m.



*Figure 13, showing Richardson (in top corner) with FBI agent (left)*
*and local police (right) watching video of his assault on police officers*
*at the Capitol on January 6, 2021(Excerpt from video Exhibit 3)*

The agents asked Richardson what he thought about his actions and behavior that day, particularly in light of the fact that Richardson's adult son is a 20-year veteran police officer. *Id.* at 16:32:20 p.m. They asked how he would feel if someone treated his son the way he had treated the officer he struck. *Id*. at 16:32:55 p.m. Richardson allowed that he might not have exhibited the best behavior he could have, *Id.* at 16:40:38 p.m., and conceded that he might have been caught up in what he called "mob mentality." *Id.* at 16:31:45 p.m., 16:35:10 p.m., 16:41:00 p.m., 16:42:34 p.m. But he was essentially unrepentant, claiming, "I don't look at the person as a police officer when he's trying to strike me." *Id.* at 16:42:57 p.m.; Exh. 4, 47:22. He also suggested that the mob had been infiltrated by people attempting to agitate the crowd and the police, 16:41:40 p.m., 16:45:15 p.m., further deflecting responsibility away from himself and attempting to justify his violent behavior with claims that were demonstrably untrue.

During the interview, without prompting from the agents (who at the time were unaware of the incident), Richardson brought up the large metal-framed billboard. Exh. 3, at 16:12:24 p.m. He said a group of younger people tried to push the huge sign into the line of police. He was close enough to touch it. *Id.* at 16:12:55 p.m. He said the sign started coming his way, and he reached out to push it back. He indicated he placed his hands on the sign to prevent it from crushing him. *Id*. at 16:39:10 p.m., 16:45:53 p.m. ("when this thing came up, all I did was try to push it back"). As a result, he claimed, he got pepper sprayed the first time. *Id.* at 16:13:01 p.m. He claimed this happened *before* he assaulted Officer R.N. with his flagpole. Richardson volunteered this information about the large billboard, and interviewing agents had not yet seen the video footage described above, so Richardson could not be questioned about the glaring inconsistencies in his story—including the fact that this incident clearly happened after he hit Officer R.N, and that

Richardson was never in the sign's way until he actively joined the effort to push it into the police officers' line.

### D.    Richardson's Statements to this Court

At his change of plea hearing on April 27, 2022, Richardson was placed under oath and asked to describe his participation in the riot. *See* Exhibit 5, Transcript of Change of Plea Hearing ("COP Tr."), at 3 (swearing in the defendant), 24 (Court asking Richardson if he agrees with Statement of Offense). Richardson volunteered that he committed the assault on Officer R.N.— the subject of his guilty plea—only after, and because of, his involvement in the incident with the "giant piece of metal" that the mob "tried to ram [] into the barrier up there—the last barrier that was protecting the back side of where the Capitol was[.]" *Id.* at 24. Contrary to the video and photograph evidence, he deflected all responsibility for participating in this assault, claiming, "I just reached up my hand to stop it coming my way." *Id*. He claimed that he grew frustrated after being pepper sprayed during this incident, and that he assaulted Officer R.N. with his flagpole in retaliation for that frustration—all of which grew out of the Trump billboard event. *Id.* at 48. Of course, as recently-discovered information makes clear, that was not true.[2] Richardson could not have assaulted Officer R.N. in retaliation or frustration for being pepper sprayed with the group at the billboard because that incident happened two minutes *after* his assault on Officer R.N.

In addition to providing false information about his role in hoisting and thrusting the billboard at the officers, Richardson even had trouble allocuting to the facts that are clearly laid out on video. Although he admitted to the assault, he claimed that he may not have hit the officer

---

[2] Richardson also wrongly insisted that he carried a "Back the Blue" flag on January 6 and not a Trump flag. *Id*. at 33. Apparently unphased by the irony of using a pro-police symbol to attack a police officer, Richardson made this assertion even though the video footage clearly shows his flag is a blue and red "Trump" flag.   *See* Exhibit 1.

directly, suggesting instead that his flagpole glanced off the bike rack barrier or was blocked by an officer's baton. *Id.* at 28.

## III.   THE CHARGES AND PLEA AGREEMENT

On December 8, 2021, a federal grand jury returned an indictment charging Richardson with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b), Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and   Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On April 27, 2022, Richardson pled guilty to the lesser included violation of Count Two, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

## IV.   STATUTORY PENALTIES

The defendant now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Assaulting, Resisting, or Impeding Certain Officers.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the sentencing guidelines calculation set forth in the PSR, which are consistent with the Guidelines calculation and recommendation agreed by the parties. *See* PSR ¶¶ 26-36; Plea Agreement (Dkt. 29), at 4. That Guidelines analysis follows:

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **24** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | -3 |
| **Total Adjusted Offense Level:** | | | **21** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 39. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 21, Richardson's Guidelines

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

imprisonment range is 37 to 46 months' imprisonment. PSR ¶ 86. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the restricted U.S. Capitol grounds, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crime weigh in favor of a significant term of incarceration. Richardson acknowledged that he crossed barriers that had been knocked over and breached in order to reach his spot at the Media Tower. When he got there, he supported the effort to run the police off, yelling, "They're not leaving voluntarily." *See* Exhibit 1. Without provocation, he moved quickly and aggressively toward the police line just as the officers were vulnerable and exposed to the angry mob, then violently swung the only weapon he had available at the officer's body. The officers deployed tear gas in an effort to control the crowd, but Richardson was only more emboldened. Just after losing his flagpole (due entirely to the force with which he swung it at the officer), he joined an effort to use a much greater weapon against a larger group of officers. In statements to this Court, Richardson indicated how dangerous he understood that metal billboard was.

Richardson has no known social media presence, and a search of his cell phone did not yield much in the way of insight to his state of mind on January 6. But his actions on January 6

show an absolute disregard for the rule of law coupled with a willingness to engage in violence. He tried to defend his actions when speaking with the FBI, suggesting that he didn't see the police as true police officers that day—in his mind, though not in reality, because the officer was "trying to strike me." *See* Exhibit 3, at 16:42:57. It is worth noting that even Richardson disclaimed any reliance on self-defense. (COP Tr. at 78) ("I wasn't trying to actually act in self-defense. I was just frustrated."). Even when the investigating FBI agents asked him to look at his conduct through the eyes of his police-officer son, Richardson refused to confront the gravity of what he had done. He has demonstrated a total lack of remorse for his role in the attack on the Capitol.

### B.  The History and Characteristics of the Defendant

Richardson, now age 72, has no criminal convictions. But in recent years he has displayed a troubling and escalating propensity toward violence, threats, and erratic behavior, reflected in serious criminal charges that remain pending. Even after this Court determined that Richardson posed such a threat to the community that he must be detained pending trial, he has steadfastly refused to acknowledge reality—that he is the aggressor in a string of serious crimes.

In July 2018, police in Philadelphia responded to a call for a person with a gun involved in a dispute with two individuals at a gas station. Richardson and the two complainants got into an argument over where the complainant had parked, blocking the gas pumps. During the argument, Richardson lifted his shirt to show that he was carrying a concealed firearm. Richardson claimed to the police that he did so because he "felt threatened," but it does not appear he offered any explanation for that feeling. Later, as the altercation continued, Richardson drew his weapon. Richardson conceded this was true; his explanation to the police was that he never pointed the firearm at either of the complainants. *See* Exhibit 6 (Philadelphia Police Department Investigation Report, July 9, 2018).

No one was arrested as a result of this incident, but Richardson's permit to carry a concealed firearm was revoked. A revocation letter was sent to Richardson in August 2018 explaining that his permit was revoked because he was determined to be "[a] person whose character/reputation indicates danger to public safety." *See* Exhibit 7 (East Norriton Township Police Department supplemental report, Oct. 29, 2020, quoting 2018 letter); *see also* PSR at ¶46, n.3. Richardson hired an attorney to contest the revocation and re-instate his permit, demonstrating his knowledge of the decision to revoke.

On October 10, 2020, Richardson was pulled over for driving a car with suspended registration; during the traffic stop, police determined that Richardson's driver's license was also suspended. *See* Exhibit 8 (East Norriton Township PD report, Oct. 11, 2020); *see also* PSR at ¶46. The officer asked Richardson if he was carrying a firearm. Richardson reported that he was not, and specifically added that his permit to carry was revoked because of an altercation in Philadelphia, and his firearm had been confiscated. But later, the officer asked Richardson again if he was armed. Only then, after first lying to the officer and pretending to be unarmed, did Richardson disclose that he had a loaded, concealed weapon on his right hip—and that in fact he "always carries" a firearm. *Id.* This caused the officer to call for backup, remove Richardson from the car, and confiscate the weapon. *Id.* Richardson was issued a summons and charged with carrying firearms and driving without a license. He was released on $5,000 unsecured bond. That case remains pending.

Less than three months later, Richardson traveled to D.C. and participated in the January 6 riot. Although his state charges were still pending, Richardson went to the front lines of the riot and found himself face-to-face with uniformed police officers working to protect the U.S. Capitol

and the people working inside. Despite his pretrial release status, Richardson made his way to the rioters' front line to commit the assault charged here.

Richardson's pattern of violence has continued since the Capitol riot. On September 23, 2021, Richardson allegedly assaulted a motorcyclist riding down his street. The victim reported that Richardson "tackled him" off his motorcycle, causing a crash. *See* Exhibit 9 (Upper Merion Township Police Report, dated Sept. 23, 2021), at 6; *see also* PSR at ¶47. The incident was witnessed by neighbors and captured on a surveillance camera located across the street from the event. As the screenshots below illustrate (Figure 14), the video shows that Richardson stood in the street in what appears to be an effort to block passage by the motorcyclist. As the motorcyclist drove by and did not yield, the video appears to show Richardson knock the rider off the motorcycle.



*Figure 14 (excerpt from neighbor's surveillance footage)*

The victim rider can be heard in the surveillance footage screaming out in pain. He was taken to the emergency room and treated for significant injuries including stitches to his eyebrow area, ligament damage to his fingers, and surgery for a "chunk taken out of his right leg." *Id.* at 7. About five minutes later, the victim's brother came to assist, carrying a metal pipe or spike. He claimed Richardson "brandished a firearm" and so he dropped the pipe. A neighbor who witnessed

the aftermath of the incident said he saw Richardson go to his truck, which was parked near the site of the crash, and pull out a knife with a 7-inch blade which he displayed to the brother.

After the incident, Richardson spoke to the police; his account was significantly different from the victim's and the neighbor's. Richardson claimed he had been trying to slow down the motorcyclist and that the rider clipped him as he (Richardson) attempted to get out of the way. He also denied brandishing any weapon, including a firearm or a knife, during the incident. *Id*. at 6. The video does not reflect any effort by Richardson to get out of the way; instead, he appears to lean into the rider's path. In short, Richardson once again deflected responsibility for his actions onto others, offering excuses for his violent behavior.

Richardson was charged with aggravated assault and other crimes relating to this incident. He was arrested on October 25, 2021. Officers arrived at Richardson's house, told him that he was under arrest, placed him in handcuffs, and brought him in the back of a police car to the Upper Merion Township police station. There, he was read his *Miranda* rights. He remained in police custody until he made his first court appearance and was eventually released on conditions and $5,000 unsecured bail. Those charges also remain pending.

Richardson's pattern of lying to law enforcement, demonstrated in the incidents described above and in this case, continued even to officers of the Court. On November 30, 2021, after surrendering to the FBI, Richardson was interviewed by a federal Pretrial Services (PTS) officer in preparation for his initial appearance in the Eastern District of Pennsylvania. The officer asked whether Richardson had ever been arrested. Richardson falsely reported that he had not, and falsely claimed he had no open cases. The officer, an experienced interviewer, clarified by asking the same question even if he had never been convicted; Richardson still said he had never been arrested. This officer, who later spoke with the FBI, recalled that Richardson provided false

answers; it was her impression that Richardson was not simply confused or mistaken. Richardson's lies during that interview were among the factors that contributed to the Pretrial Services recommendation of detention.

Again before this very Court—even after the Court expressed concern about Richardson's inability to take responsibility for his behavior in his detention hearing—Richardson seems to have rejected any lessons from these incidents. At his change of plea hearing, rather than allocute to the straightforward facts in the Statement of Offense (which Richardson reviewed and signed), Richardson offered more excuses and more deflection.

In short, despite his age, the defendant's violent crimes on January 6 were not an isolated event. Richardson's life in recent years has been marked by troubling behavior and a refusal to admit any wrongdoing. Although he lived many years without criminal convictions, these repeated recent incidents are worse than troubling—they are dangerous. And they weigh strongly in favor of a lengthy sentence of imprisonment in this case.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The defendant's assault on police is the epitome

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

of disrespect for the rule of law. When Richardson entered the Capitol grounds, it was abundantly

clear that lawmakers, and the police officers who tried to protect them, were under siege, and

Richardson was in the forefront of that siege. Police officers were overwhelmed, outnumbered,

and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack

that day. A lesser sentence would suggest to the public in general, and to other rioters specifically,

that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.

In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a

"legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for

the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010). Both goals require a lengthy term of imprisonment here.

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh strongly in favor of

incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The

violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the

most important democratic processes we have: the transfer of power. As noted by Judge Moss

during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay

in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Richardson has a criminal history category of I, his recent contacts with law enforcement show a pattern of assaultive behavior. And he has shown no remorse for his actions whatsoever, even though his own son is a police officer much like the officer he assaulted. Yet up to now, he has faced no consequences for his actions. A significant prison term may be the most effective way to communicate to Richardson that his bad behavior will not be tolerated.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. A considerable number of persons have been charged with crimes based on the January 6 riot. This includes

hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion— the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F. Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other assaultive conduct in other cases. To try to mechanically compare other § 111(a)(1) defendants outside of January 6 would be a disservice to the magnitude of what the riot entailed and signified.

This case bears significant similarities to others in which defendants were convicted by guilty plea of assaulting police officers during the riot at the Capitol on January 6, 2021. In those other cases, courts in this District have imposed lengthy sentences of incarceration, including sentences similar to what the government is requesting here. *See, e.g.*, *United States v. Rubenacker*, 1:21-cr-193 (BAH) (41 months' incarceration); *United States v. Creek*, 1:21-cr-645 (DLF) (27 months' incarceration); *United States v. Thompson*, 1:21-cr-461 (RCL) (46 months' incarceration); *United States v. Languerand*, 1:21-cr-353 (JDB) (44 months' incarceration); *United States v. Palmer*, 1:21-cr-328 (TSC) (63 months' incarceration); *United States v. Fairlamb*, 1:21-cr-120 (RCL) (41 months' incarceration); *United States v. Miller*, 1:21-cr-75 (RDM) (33 months' incarceration); *United States v. Mattice*, 1:21-cr-657 (BAH) (44 months' incarceration); *United States v. Mault*, 1:21-cr-657 (BAH) (44 months' incarceration).[5]

---

[5] In an outlier case, one defendant charged with assault under 18 U.S.C. § 111(a)(1) was sentenced to just six months in prison. *United States v. Leffingwell*, 1:21-cr-5 (AJB), Judgment, Dkt. 51. Although the government recommended a Guidelines-based sentence of 27 months (Leffingwell's assault did not involve the use of any dangerous weapon), the 6-month sentence imposed by the court was the result of mitigating factors not present here—primarily, the defendant's significant

The sentence in *United States v. Ponder*, 1:21-cr-259 (TSC), may be particularly instructive, because the facts in that case align closely with Richardson's. Like Richardson, defendant Mark Ponder used a flagpole to assault an officer near the bike rack barriers on the West Plaza. *See* U.S. Sentencing Memorandum, Dkt. 54, at 12. When Ponder swung, the officer raised his riot shield in defense, and Ponder's flagpole broke in his hands. *Id*. Like Richardson, Ponder then retreated back into the crowd. *Id*. But, also like Richardson, Ponder emerged from the crowd moments later with a sturdier weapon that he used to hit a group of officers. *Id*. at 13. About fifteen minutes later, Ponder moved to the Upper West Terrace, and used the same sturdier pole to assault an officer there, striking him on the shoulder. *Id.* at 14-15. Officers restrained him at the scene, but had no way to transport him, so he was released with directions to leave the Capitol grounds. *Id.* at 15-16. (Richardson, who had been dosed with pepper spray after assaulting officers, received a similar if non-verbal message.) Ponder did not leave; he stayed on the restricted grounds until after 5:00 p.m. *Id.* at 16-19. Later, in an interview with the FBI, Ponder was equally unrepentant, presenting his point of view as though his conduct was justified. *Id.* at 21.

Judge Chutkan sentenced Ponder to 63 months in custody, near the middle of his Guidelines range of 57 to 71 months. *See* Plea Agreement, Dkt. 48, at 2-3. Ponder pleaded guilty to violating 18 U.S.C. § 111(b), a more serious crime than the § 111(a) charge to which Richardson pleaded guilty. As a result, Ponder's final offense level under the Guidelines was 23, two levels higher than Richardson's under U.S.S.G. §2A2.2(b)(2). In addition, Ponder was in Criminal History Category III, leading to a higher range of imprisonment. But given the strong factual similarities between Richardson's and Ponder's assaultive conduct on January 6, Judge Chutkan's

---

neurological conditions and mental health issues brought on by an attack he experienced while serving with the Army National Guard in Iraq in 2008. *See* U.S. Sentencing Memorandum, Dkt. 31, at 15.

sentence in *Ponder* is an appropriate comparator for this case, even though the government is recommending a substantially lower sentence for Richardson owing to Ponder's criminal history.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer R.N., did not require treatment or suffer known bodily injury as a result of Richardson's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Richardson must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[7] Plea Agreement at ¶11, p.8. As the plea agreement reflects, the riot at the United States

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Richardson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶105.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 46 months, a high-end sentence as calculated by the government and as agreed upon by the parties in the plea agreement, a period of supervised release of three years, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   /s/ *Emily W. Allen*
Emily W. Allen, Cal. Bar No. 234961
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
emily.allen@usdoj.gov