```
 1                 IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                   Plaintiff,         1:21-cr-00721-CKK-1
                                        Friday, August 26, 2022
 5    vs.                               10:08 a.m.

 6    HOWARD CHARLES RICHARDSON,

 7                   Defendant.
      - - - - - - - - - - - - - - - x
 8
 9    _____

10                TRANSCRIPT OF SENTENCING HEARING
          HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
11                    UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13    For the United States:        EMILY W. ALLEN, ESQ.
                                     DOJ-USAO
14                                   United States Attorney's Office
                                     222 West 7th Avenue, Room 253
15                                   Anchorage, AK 99513
                                     (907) 271-4724
16                                   emily.allen@usdoj.gov

17
      For the Defendant:            THOMAS C. EGAN, ESQ.
18                                   THOMAS C. EGAN, III
                                     618 Swede Street
19                                   Norristown, PA 19401
                                     (610) 585-0201
20                                   tom101861@aol.com

21    Court Reporter:               Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
22                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
23                                   Washington, DC  20001
                                     (202) 354-3187
24

25
```

```
1                          P R O C E E D I N G S

2                  THE COURTROOM DEPUTY:  Criminal Case 21-721, The

3       United States vs. Howard Charles Richardson.

4                  Counsel, would you please identify yourself for

5       the record starting with the government.

6                  MS. ALLEN:  Good morning, Your Honor; Emily Allen

7       for the United States.

8                  THE COURT:  Good morning.

9                  MR. EGAN:  Good morning, Your Honor; Tom Egan on

10      behalf of Mr. Richardson, and Mr. Richardson is present.

11                 THE COURT:  Good morning, Mr. Egan.

12                 And good morning, Mr. Richardson.

13                 All right.  We're here for a sentencing.

14      Mr. Richardson pled to Count 2, the lesser included offense

15      of assaulting, resisting, or impeding certain law

16      enforcement officers.  The statutory maximum is eight years.

17      The statutory fine maximum is $250,000.  He has agreed to

18      restitution in the amount of $2,000, which goes to the $2.7

19      million of damage that's to the Capitol at this point.

20      There's no restitution as it relates to the officer.

21                 I have a presentence report, the government's

22      memorandum in aid of sentencing, and various videos that

23      were provided -- I'm assuming to defense counsel as well --

24      which are videos of the events, an interview with the FBI,

25      both the video as well as a transcript, and a transcript of
```

1    the plea hearing.  I think there were about ten exhibits.

2              You did receive that, Mr. Egan; is that correct?

3              MR. EGAN:  I did, Your Honor, and I've reviewed

4    them.

5              THE COURT:  All right.  Thank you.

6              And I received a defendant memorandum in aid

7    of sentencing.  Attached were 11 letters in support of

8    Mr. Richardson; four were from family -- a niece, a nephew,

9    and his two daughters -- six were from friends, some through

10   his business, and some just from the community.

11             In terms of objections to the presentence report,

12   there are none.

13             The advisory sentencing guidelines.  The offense

14   level; the base is 14 points.  The weapon, which was a

15   flagpole, is an additional four points.  Based on the

16   victim, it's an additional six points, so it's 24 points.  I

17   will give him the three points for acceptance of

18   responsibility reduction, which puts it at a total offense

19   level of 21.

20             In terms of criminal history, he has no

21   convictions.  I've excluded, and the presentence report

22   writer excluded, all traffic offenses, minor ones, so he's

23   in Criminal History Category 1.  And the advisory sentencing

24   guidelines for Offense Level 21 and Criminal History

25   Category 1 are, in terms of custody, 37 to 46 months.

1    Supervised release is one to three years.  He would be

2    ineligible for probation.

3         The fine is a range of $15,000 to $150,000.  The

4    restitution, as I've indicated, is $2,000, and a special

5    assessment of $100.

6         Since the presentence report is undisputed, I'm

7    accepting all portions of this undisputed presentence report

8    as findings of fact under Federal Rule of Criminal Procedure

9    32(i)(2)(A).  I guess that's maybe 3.  I'll adopt the

10   presentence report as written.

11        I'll hear from the government.  I'll hear from

12   defense counsel.  One question that I would ask, Mr. Egan,

13   if you could address as part of your allocution is the

14   restitution, whether he's paying it up front in a payment

15   schedule or just to give me some idea of what he's thinking

16   of doing with that.  And then Mr. Richardson can address the

17   Court, if he wishes to, as well.

18        So let me start with the government at this point.

19   And you can take the mask down.  It's too hard to get a

20   record.

21        MS. ALLEN:  Thank you, Your Honor.

22        Your Honor, I understand where the probation

23   officer -- how the probation officer arrived at the

24   recommendation of a significant variance of 18 months, and

25   to be honest, when I first took this case and began

1    preparing the arrest warrant in the case, I would have made

2    a similar recommendation.  I may have made a similar

3    recommendation for something even lower than the guidelines.

4    But since the time of Mr. Richardson's arrest we've learned

5    a great deal more information that suggests not only is he

6    more criminally culpable than we first knew, but also that

7    he has a pattern in recent years of acting very dangerously,

8    posing a significant danger to the community, and failing to

9    make any indication that he has an understanding of the

10   consequences of his behavior and the fact that he has failed

11   to acknowledge it, to take any corrective action, or to do

12   anything that suggests that he will not continue to be a

13   danger, if he's released.

14          And it built and built and built at every stage as

15   we went through the case; from the day of his arrest, when

16   he spoke with the probation officer in his district of

17   arrest a couple of days later, to his change of plea hearing

18   in this case.  At every stage he continued to display

19   troubling behavior even after being on notice multiple times

20   that the fact that he was unwilling to take responsibility

21   for his actions, to recognize the dangerousness of his

22   conduct, and the difficulties that he's caused for victims

23   of his crimes were causing him further trouble.

24          Even after his detention hearing, after his bail

25   review hearing by this Court, and at the change of plea

1    hearing he has continued to fail to take responsibility for

2    that.  And I think it's not just troubling; it indicates

3    that he continues to pose a danger to the community.  So

4    we're asking for a high-end sentence in this case, which I

5    understand is outside of the norm, for those reasons.

6              And first, the conduct on January 6th turns out to

7    be significantly more serious than was first understood even

8    by the time of his change of plea hearing in April, and I've

9    set out in the government's sentencing memorandum, which I

10   know the Court has reviewed, and shown video in that -- in

11   the exhibits there that show Mr. Richardson's explanation

12   for his behavior that day is completely false.

13             He told the Court and he told the FBI that he

14   acted out of frustration because he had been sort of

15   mistakenly understood to be part of this billboard incident,

16   and that he got pepper-sprayed because he was trying to

17   protect himself from the billboard, and as a result of that

18   frustration, he acted uncharacteristically and swung his

19   flagpole at an officer.

20             Of course now we know that is absolutely not true,

21   and it wasn't until after the change of plea hearing that we

22   were able to find videos that showed Mr. Richardson after he

23   swung the flagpole at our victim here.  He took it upon

24   himself to approach this very large billboard, steel-encased

25   billboard that was larger than ten feet across.  He saw the

1    rioters who had hoisted it up.  He quickly made his way over

2    to help them and joined the effort to use that very large

3    billboard as a battering ram to break through the police

4    line.  That was the same police line he attacked just a

5    couple of minutes earlier.

6          They actually did break the police line, and I'm

7    sure Your Honor has seen the video that show the bike rack

8    barriers that were the only barrier between the police and

9    the mob that was working to attack them broke down.  The

10   officers were very engrossed in protecting themselves and

11   others from this very large, very heavy object, successfully

12   did move it away from the rioters fortunately, but in the

13   course of doing that there was a gaping hole in the police

14   line that was caused by that.  Mr. Richardson was front and

15   center, and he grabbed onto the structure of that sign, and

16   you can see in the video him forcibly pushing it toward the

17   police.

18         There is no way of looking at that video to see it

19   as him protecting himself from the battering ram, from the

20   sign, from him, you know, putting up his arms to keep

21   himself safe because he actively walked over to join the

22   fray, and then can be seen pushing it into the police.

23         The fact that Mr. Richardson's explanation to this

24   Court in April happened after we'd gone through multiple

25   rounds of litigation where the government and the Court

1    repeatedly noted his failure to take accountability for his

2    actions and to acknowledge his role in these escalating

3    problems is particularly troubling.

4              So that's the conduct on January 6th.

5              And then, of course, Mr. Richardson doesn't have a

6    criminal history that scores in his guidelines calculation,

7    but he does have a tremendous troubling recent history that

8    is not aberrational.  It's gone on now for enough years that

9    it shows a very troubling pattern since 2018 of him being

10   violent, being -- refusing to obey law enforcement and the

11   laws that apply to everyone.

12             He pulled a gun on a couple of other citizens at a

13   gas station.  His concealed weapons carry permit was revoked

14   as a result of that.  He nevertheless continued carrying a

15   concealed weapon.

16             He was pulled over in a traffic stop in 2020, and

17   the police officer who pulled him over asked if he had any

18   weapons.  He said no.

19             After a couple more questions and potentially his

20   realization that he was going to be caught with that gun, he

21   then finally changed his story and said yes, in fact, I have

22   a gun in my belt, and I always carry a gun concealed.  And

23   it was clear he knew his permit to carry a concealed weapon

24   had been revoked by that time because he had already hired

25   an attorney to help him address the revocation of his

1       permit.

2               He was arrested for that -- I'm sorry, he was

3       given a summons for that.  He was charged and released.  He

4       had a $5,000 bail.

5               And then, while he was on pretrial release for

6       that case, he went to the Capitol, and he attacked the

7       police line at the U.S. Capitol on January 6th.

8               After January 6th he was involved in the

9       incident where he pushed the young man off of his motorcycle

10      out in front of Mr. Richardson's home.  And I know we've

11      gone through the facts of that incident in the course of

12      Mr. Richardson's detention hearing, but I think it bears

13      repeating that there were some witnesses.  There was a video

14      camera.  A neighbor's security camera took footage of that

15      incident.  There was the victim and his brother and another

16      neighbor who came out to see what had happened.

17              All of the other accounts, including the video of

18      that incident, show Mr. Richardson planting himself in the

19      middle of the street ready to knock this young man off of

20      his motor bike.

21              Mr. Richardson's account is that the motor bike

22      clipped him, and that it was essentially an accident.  It's

23      simply not true.

24              And the injuries that were caused to this young

25      man are significant.  He had to have surgery.  He spent

1    several days in the hospital.

2            Mr. Richardson was charged in that case.  That

3    case remains pending so it, of course, doesn't score in his

4    criminal history, but it is very troubling not only that he

5    is willing to attack another citizen in the streets in

6    Pennsylvania, but then to refuse once again to take any

7    responsibility for the fact that he caused significant

8    trauma for this individual who was then in the hospital for

9    several days.

10           I think a 46-month sentence in this case is

11   absolutely appropriate.  It's within the guidelines range,

12   and I think the guidelines in this case produce a sentence

13   that is the minimum necessary to achieve the goals of

14   sentencing under Section 3553(a).

15           THE COURT:  All right.  I don't have any questions

16   at this point.

17           Mr. Egan.

18           MR. EGAN:  Judge, may I?  I'm fully vaccinated.

19           THE COURT:  Yes.

20           MR. EGAN:  Thank you.

21           Good morning again, Your Honor.

22           THE COURT:  Good morning.

23           MR. EGAN:  Your Honor, I'm going to address part

24   of what was raised by the government in the last portion of

25   their presentation and then move forward with my

1    presentation with regard to the sentence here.  And I

2    preface that with suggesting that the recommendation that

3    was made by the probation department, as I noted in my

4    sentencing memorandum, is a fair and just recommendation

5    given the totality of those circumstances, all of which were

6    encompassed and addressed in the presentence report.

7         We did ask the Court to shave some time off the

8    recommendation made by probation for reasons which I will

9    explain in a few minutes; however, we are in agreement with

10   that recommendation by and large.  It's appropriate.  It's

11   well-reasoned and rational given the circumstances presented

12   here with the totality of Mr. Richardson's existence for 72

13   years on this planet.

14        I am Mr. Richardson's counsel with regard to the

15   incident involving the dirt bike/motorcycle in Montgomery

16   County, Pennsylvania, and since there has been mention of

17   the factual allegations in that case, I can address the

18   Court with regard to the actual facts of that case because I

19   have the video, and I was at the preliminary hearing

20   litigating the issues that were presented there.  And the

21   video shows that Mr. Richardson, in front of his own home,

22   stepped out into the street to try and get a guy who is

23   known in the neighborhood and known by the Upper Merion

24   Police Department to be very much a troublemaker and tried

25   to get him to slow down while he was driving down the middle

1      of the street on a quiet, peaceful morning.  And the video

2      actually shows Mr. Richardson standing in the middle of the

3      street and going like this (indicating), and the video,

4      which is taken from left to right, shows the motorcycle

5      about to strike Mr. Richardson.  He doesn't deviate from his

6      path whatsoever.  And Mr. Richardson pushes the motorcycle

7      to avoid being struck by it.

8              And that's what the video showed at the

9      preliminary hearing.  That's what the video's going to show

10     moving forward as we move forward with litigation of that

11     case in Montgomery County.  And we're fortunate that it's on

12     video because you have contrasting versions that have been

13     given by the complainant in the case, and we will be able to

14     corroborate that.

15             So I'm not suggesting it is outstanding behavior

16     by Mr. Richardson, but it is not presented as somebody who

17     just ran out of his house that morning at 70 years of age

18     and decided, hey, I'm going to push this motorcycle over for

19     no reason.  That is not what happened, and that's not what

20     the video bears out, and I can say that firsthand having

21     seen all the discovery in the case.

22             But walk backwards because I take a look at the

23     sentencing factors, which have been addressed in the

24     sentencing memorandum, and the Court is supposed to take a

25     holistic approach to the sentencing in essence.  It's a

1    broad term.  It's not really a legal term, but it's

2    something that we're supposed to do by evaluating all the

3    factors of the case, the factors of the particular

4    defendant, and what kind of message are we sending to

5    society in how we deal with these situations given all of

6    those other factors.

7           And what you have before you is a 72-year-old

8    man -- and I'm not suggesting 72 is one foot in the grave.

9    I know I'm not much younger, and you're in the same age

10   range as all of us, and we're still vibrant active people.

11   But this was the first time Mr. Richardson was ever

12   incarcerated in his entire life, and it has taken a

13   significant toll on him physically, mentally, and

14   emotionally.  And he's run the gamut of what you would

15   expect in terms of emotions.  Sometimes there's unhappiness

16   of being where he is.  Sometimes there's disappointment in

17   himself about having put himself in that position.  There's

18   the frustration that he has left others to care for the

19   business that he for many years cultivated and groomed into

20   being a very successful business.

21          He misses his grandchildren.  He misses his long-

22   time partner, Linda Volpe, and has not been able to spend

23   time with her.  And because of the family obligations that

24   other members in his family and extended family have, they

25   don't have the ability on any frequent basis to take the

1    five-hour trip south to Northern Neck Regional Jail to go

2    visit him on any regular basis because they have to allot

3    roughly 12 hours between the round-trip travel and the time

4    they will be able to sit across a telephone through

5    Plexiglas to speak to another inmate.

6         So it's been hard on him, and I'm not suggesting

7    it shouldn't be hard on him.  That's the price you pay for

8    having engaged in illegal behavior such as this.

9         But it also is a message sender, because if he had

10   never had a significant taste of jail like he has now had,

11   he wouldn't know what it was like.  He wouldn't know what

12   the toll is going to be on his personal being and his

13   extended life that has all these tentacles into other people

14   and other areas with whom he touches every day.

15        And sending him back to jail for an extended

16   period of time does not serve the goal of making certain

17   that Mr. Richardson is not going to be a recidivist.  It

18   doesn't serve the goal of really trying to send some

19   catastrophic message to society that if you're 72 years old

20   with no prior convictions and do something egregious like

21   this this is what's going to happen to you.

22        We are fortunate of the circumstances themselves

23   that were presented.  I would like to address those

24   directly.

25        Mr. Richardson went there.  As has already been

1    noted, and I'm sure he will say, he didn't go there with the

2    intention of hurting anybody.  There were others who went

3    there, as we've seen in the press accounts and you might

4    have seen in the courtroom, with the express purposes of

5    causing mayhem or mischief that day.  There are some of

6    those that went there.

7         Mr. Richardson was an elderly man who went there

8    as a President Trump supporter who fervently believed, right

9    or wrong, that the election had been taken from him.  That

10   was his belief structure.  And given that belief structure,

11   he went down there hoping that the Electoral College and/or

12   Vice President Pence would do something differently with

13   regard to the election.

14        There were -- depending on what news sources you

15   read or what media reports you read, there were rumors going

16   around in our national media that maybe something would

17   change.  Maybe Vice President Pence would do something.

18   Nobody really knew because there was rampant speculation.

19   And fortunately, the Electoral College and Vice President

20   Pence did their job, and they did it appropriately, and they

21   did it constitutionally.

22        But Mr. Richardson had gone there thinking that

23   maybe things would change, and maybe the person that he

24   wanted in office was going to be restored to office because

25   things were going to change within the Capitol building

1   themselves.

2          He brought his Trump flag with him in support, not

3   with any intention of spearing anybody or hurting anybody

4   with it.  He was there as a flag-waver like countless,

5   hundreds, of other people that had their banners and flags

6   and signs that day.

7          And he got caught up in the mob mentality.

8   There's no doubt about it.  He got caught up in the mob

9   mentality.  He was one of the trailers in a sense in terms

10  of with the crowd.

11          He wasn't breaking into the Capitol building

12  itself.  He never went into the Capitol building itself.

13  But he readily acknowledges that he went past barriers that

14  he's not supposed to go past, and he kept going farther than

15  he was allowed to go -- and he's going to address these

16  things in his allocution, and I've addressed them in my

17  sentencing memorandum to a great extent -- and he got caught

18  up in that.

19          And it's not an excuse for what it is that he did.

20  I have to make sure that's very clear.  It is an explanation

21  as to what happened, not an excuse for the actions that were

22  made.

23          And you can see on the video that was presented

24  that shows the incident itself, that pepper spray was

25  beginning to fly again.  I looked at it very carefully a

1    dozen times.  And you can see there's a woman in the

2    very forefront of the video that starts going like this --

3    (indicating) -- with her clothing because the pepper

4    spray was starting to fly.  And as soon as that happened,

5    Mr. Richardson, who had already been pepper-sprayed before,

6    he took his flagpole, and as you saw in the video, and he

7    struck it down three times.  Two reach the barrier, two

8    reach the baton or the hands of that officer, who is

9    standing closest to him, and on the third the flimsy flag

10   point broke in half because it's a segmented flagpole, and

11   between the friction caused by the flag coming down and the

12   pole, the pole broke.  So a third strike never reached its

13   target.

14          He was trying to hit the barrier.  He did hit

15   the hands of that officer or the baton of that officer or

16   both.  And everybody in this courtroom is grateful that

17   nobody was hurt -- not a law enforcement official and

18   not Mr. Richardson in retaliation by a law enforcement

19   official -- for what it is he had done to that law

20   enforcement official.  There's no justification, no excuse.

21          But in looking at where Mr. Richardson is taking

22   responsibility, Mr. Richardson has never been in a posture

23   where he has wanted a trial in this case.  He has wanted to

24   plead guilty in this case because he knows what he did is

25   wrong.  And did it take a while for him to reflect upon

1    things?  It did.  He's a stubborn man.  And did it take a

2    while for him to really comprehend his actions?  I dare say

3    it probably took the incarceration to make it sink deeper

4    into his mind what the consequences were of the actions he

5    took because, if he hadn't been incarcerated, I suggest to

6    this Court, given his somewhat stubborn nature, he still

7    would look at this a little bit differently than he does

8    now.

9         But now he's had time to interact in the prison

10   with inmates who are related to the riots.  He's had an

11   opportunity to interact with people who are in there for

12   just the regular everyday crimes that we commit.  And he has

13   made an affirmative choice that this is not where I want to

14   be.  This is not any life I want to live.

15         And so for the Court, if the Court -- the Court

16   knows that eventually Mr. Richardson's going to be released

17   from prison, whether it is tomorrow or whether it's after

18   47 months, depending on what you do with the sentence, but

19   we still have to deal with the Howard Richardson that's

20   going to be released.  And I suggest to the Court in dealing

21   with the Howard Richardson that's going to be released,

22   one of the important components of what the Court should

23   order is the Court should order a mental health evaluation

24   of Mr. Richardson at this point because the actions in which

25   he engaged are out of character with 70 years of his

1    history, and we need to find out while, as he ages, are
2    there other things going on mentally, emotionally, or
3    intellectually in his life that we need to put structure of
4    some type or counseling of some type in place.  Because we
5    all know that people normally act in conformance with what
6    their character is, and that's why we say, when we meet
7    people who are acting oddly compared to what we know, "I
8    can't believe he or she did that.  I can't believe he or she
9    acted that way."  Because we noticed when they're acting not
10   in conformity with who they are.
11           Who Mr. Richardson is.  Mr. Richardson is a father
12   and a loving father.  Mr. Richardson is a grandfather and a
13   loving grandfather.  Mr. Richardson is somebody who served
14   our country for four years honorably and was honorably
15   discharged.  He served overseas in doing that.  He's a man
16   who has tried to continuously educate himself, whether it's
17   through formal education or keeping up with current events
18   and being aware of what it is that happens throughout the
19   world that could impact others that he knows through our
20   daily lives.
21           He's somebody that took his business from a base.
22   He didn't buy a business that already existed.  And he
23   hustled, and he busted his butt to build a business up that
24   was something that could support him and support his long-
25   time love and support them in a lifestyle that is middle

1    class; not upper class, not even upper middle class, just a

2    middle class hard-working guy who goes to work long hours

3    five days a week building and honing a great business

4    reputation.  That's who he was.

5            And when he had his off time, he was enjoying his

6    other activities.  He was enjoying his family, and he was

7    enjoying his extended family, and he was enjoying his

8    friends.

9            That's who he is.  A normal Everyday Joe who got

10   caught up, like so many others, in the terrible events of

11   January 6th last year.

12           So when you look at that track history, I suggest

13   to the Court it's important because you don't have a 25-

14   year-old or a 35-year-old or a 45-year-old coming before you

15   where you don't know what's going to happen with them

16   because they have a checkered past, where they haven't been

17   around long enough to really set parameters that a court

18   could use to decide what that person is really like, what

19   makes them tick.

20           Mr. Richardson is all those things that I

21   suggested in the sentencing memorandum, and all of those

22   things that I just suggested in my allocution to you, Judge.

23   And in moving forward, I suggest we do need to consider what

24   kind of needs he has, and that's why I mentioned the mental

25   health assessment.

1          There are no drug or alcohol issues.  He's never

2     presented with them throughout the entirety of his life.

3          And we also need to look at what ability he's

4     going to have moving forward in terms of any financial

5     stability as he continues to age.  He doesn't have the

6     benefit of a pension.  He doesn't have the benefit of having

7     a well-funded 401(k) or well-funded IRAs.

8          He's a man that goes month to month working hard

9     and paying his bills, squirreling a little bit away, but not

10    a lot away, and has insignificant savings, in the grand

11    scheme of things, to be able to support him, if he's not

12    able to work.  He's going to be relying upon his Social

13    Security, Medicare, Medicaid, and what other odds and ends

14    he can pick up financially to keep his day-to-day life

15    going.  And it is important for him, if he's going to have

16    any hope of regaining financial -- meaningful financial

17    stability and being able to maintain his business, that he

18    is released from prison sooner than later.  I'm not

19    suggesting a number to you, Judge, but sooner than later.

20         And the reason is Linda Volpe is the one who is

21    now hiring outside contractors to try and keep just two-

22    thirds of that business alive.  He's already lost a third.

23    And in keeping that two-thirds of the business still alive

24    she has to pay those independent contractors to do it.

25         So where that money would have normally flowed

1    back into Mr. Richardson's coffers directly because he was

2    the one doing the work, that doesn't exist right now.

3    There's a split, and the split is not favorable to

4    Mr. Richardson.  It's favorable to the contractor who's

5    actually doing the work.

6         And his goal -- he being Mr. Richardson -- his

7    goal down the line is to get the business built back up, and

8    he believes he can because he did such a good job for

9    countless decades in building the business; that he then can

10   sell the book of business, the contracts that he has with

11   these people, to somebody else and use that money finally to

12   retire maybe at 74 or 75 years old because that's what he's

13   looking at right now.  Otherwise, it's going to be very

14   difficult to maintain the business at all.

15        So when he gets out, if he's incarcerated for any

16   substantial period of time additionally to what he already

17   has, the business is going to be by and large gone because

18   Linda Volpe can't maintain it.  It's not her expertise.

19   It's not her forte.  And she's doing it as a caretaker to

20   try to keep it alive until Mr. Richardson gets out.

21        So, Judge, in boiling all of that down, what do

22   you do with a man who is now 72 years old, never arrested in

23   his life before the age of 70 or 71, has no prior

24   convictions whatsoever, and has all those other outstanding

25   attributes that we would hope anybody in our family would

1    have with regard to family, friends, and business?

2        And I suggest to the Court that you can take a

3    chance on Mr. Richardson.  You can sentence him to the

4    recommendation that's been made by the probation department.

5    We are hoping that you would go a little bit lower than that

6    for business purposes only, but as I made clear in the

7    sentencing memo and I've made clear now twice today, we have

8    no quarrel at all with the recommendation that was well

9    thought out by the probation department because they

10   recognize all of the balancing interests that are in this

11   case, not just focusing on a small window of time in a 72-

12   year existence on this planet.

13       THE COURT:  I have two questions.

14       In terms of your request for a mental health

15   evaluation, is there any issue about competency?

16       MR. EGAN:  There is not.

17       THE COURT:  Okay.  I just wanted to make sure.

18   You've been dealing with him for quite some time.

19       MR. EGAN:  I have, Judge.  I've been dealing with

20   him since the inception, and it is very clear that he

21   understands the legal process and is able to comprehend all

22   the legal principles that are involved.  I just know from

23   having -- as I'm getting older and I see so many people --

24   you know, we look at family and friends; sometimes you see

25   people's personalities change, and there are different

1    reasons behind it.  And it doesn't mean they're not talented

2    people or productive people, but sometimes there are things

3    going on in people's lives as they age that can change a bit

4    of who they are or who they're going to be, and I would just

5    like to see that explored in case something like that's

6    going on with him now in his 70s.

7              THE COURT:  Okay.  The other question was

8    restitution, as to whether he is planning on paying it

9    outright?  Doing a schedule?

10             MR. EGAN:  Judge, he would have to do a schedule

11   at this point.  I know he does not have the financial means

12   to pay it outright at this point in time.

13             THE COURT:  Okay.  And if you were going to

14   suggest an amount monthly, what would you suggest?

15             MR. EGAN:  Judge, if he is incarcerated, I don't

16   believe there's any payment that could be made because

17   they're trying to keep the house alive and keep the business

18   going.  But if he is out, I suggest he would be able to pay

19   $500 a month, if he was back running his business again.

20             THE COURT:  Okay.  All right.

21             Mr. Richardson, you can address the Court as well.

22   You can do it seated with your microphone, just make sure

23   it's on, and you can take your mask off so we can actually

24   hear you carefully.

25             THE DEFENDANT:  Thank you, Your Honor.

1          THE COURT:  You can sit.  You can go ahead and sit

2     and just move the microphone.  It will be easier for you.

3          Go ahead.

4          THE DEFENDANT:  Can you hear me fine?

5          THE COURT:  Yes.

6          THE DEFENDANT:  After hearing Tom talk and hearing

7     everybody speak, the first thing I want to say is I am

8     sorry.  This was not my intention whatsoever.  I had no

9     intention to do damage or hurt anybody.  I'm just thankful

10    that no one was hurt.  That was certainly not my intention.

11    It was very disappointing.

12          I came there when I was invited there by friends

13    and some organizations that somehow got ahold of me.  The

14    words that were used routinely were, "Come down to the

15    celebration.  There's going to be a big party."  I knew it

16    was the day for the Electoral College to make their count

17    officially known, and I thought it was going to go in a

18    direction that I was hoping it was going to go, so I was

19    just -- I was not there for that.

20          I was not there to get into the building or do

21    anything like that.  All I wanted to do was to be there,

22    like I said, to help be part of the celebration.  That's

23    what I thought was going to happen.

24          MR. EGAN:  Just read what you wrote.

25          THE DEFENDANT:  I'm just reading here.

1      While I was walking to the Capitol, I did observe

2   many things that indicated something was wrong, and I

3   ignored them.  I didn't put two plus two together.  Not as

4   an excuse, my cell phone coverage, the Internet, whatever it

5   was, was cut off.  I had no way to contact other people that

6   I knew there.  If I had been with the friends I went down

7   and was hoping to meet with, they probably would have said

8   something's up, but I didn't come to the knowledge of that.

9   But I did observe things that told me something was wrong

10  going on here.  Something was definitely wrong.

11      When I was hit with this pepper spray, I was

12  blinded, and I sought shelter under the scaffold there that

13  I was standing right behind.  And naturally, somebody came

14  over and said to me, "Throw this water in your face.  It

15  will help you."  And I said oh, yeah, sure, and as soon as I

16  did, it was not the thing to do.  Water must have

17  exacerbated with this chemical and just burned my face.  My

18  face was on fire so it continued to disorient me.

19      It took me a good 15, 20 minutes to start to have

20  some semblance of normalcy.  At that time there were several

21  people that I had been talking to, and they said, "We need

22  to leave.  Let's get out of here.  This is out of control.

23  It's getting crazy here."

24      And they were right.  I couldn't see what was

25  going on, but after 15 or 20 minutes I said, "You know what,

1    I don't need this.  I don't want to be here for this, but,"

2    I said, "I dropped my flag."

3         When I was pepper-sprayed the first time, I

4    dropped my flag.  So I went back outside of the scaffold,

5    because it was laying right there, to pick it up.  And it

6    was all bumbled and jumbled up.  And I was unfurling it, and

7    then the pepper spray started again, and I just -- in fact,

8    one of the people I was talking to that was -- you know, we

9    were having a nice conversation.  I don't even know if it

10   was a he or she, but she was hit in the head with the pepper

11   spray.  I could feel it hit in my windbreaker, and I just --

12   I was so disappointed, I lost my temper.

13        And if I hadn't gone out there to get my flag, I

14   would have had nothing in my hands.  But it was in my hands.

15   I was upset, I lost my temper, and I swung in the direction

16   of the officer.  I never should have done that.

17        I know Tom covered a little bit of my background.

18   I don't know if I need to go into any more, but I just want

19   to say there's no excuse for what I did, and at that precise

20   moment, if I hadn't gone back out to get my flag, if I had

21   left in that instance when they said, "We need to get out of

22   there," there would have been nothing in my hand, and I

23   would have left with them.

24        But that's when I lost my temper.  And I had the

25   flagpole in my hand.  It was a 1/32-inch aluminum flagpole.

1    It certainly was not a weapon that could hurt anybody.  I

2    didn't bring it there as a weapon.  I just brought it as,

3    you know, support.

4            I think he covered some of the things I was going

5    to say, but if I'm being lengthy here or too laborious about

6    this, I'm just saying here that I have a background that

7    shows I am a good citizen.  I've been a good neighbor.

8            I was drafted -- I was drafted in the Vietnam War

9    in 1969.  I didn't even think about not serving, and, in

10   fact, I accepted a four-year obligation from the plan that

11   the recruiter made available to me, and I served that.

12           I had a top secret crypto clearance, the highest

13   clearance you could have as an NCO.  I was honorably

14   discharged.

15           A year later I went back and I joined the reserve

16   unit because there was a military intelligence unit close to

17   where my home was, and I hadn't started my business yet, and

18   I thought, you know, I could use my background that I had in

19   active duty service and make a little extra money with that.

20   You know, you serve one weekend, blah, blah, blah.  So I did

21   that.

22           As Mr. Egan had said, I started my own pest

23   control business in 1977.  I've been with the same woman for

24   20 -- almost 25 years at the same address.  I've been going

25   to the same church for the same amount of time, 25 years.

1    I'm the committee man for my neighborhood.  I interact with

2    my township.

3              There's a whole lot of things I'd like to say, but

4    I don't want to be too overdone with this.  But I have

5    learned my lesson, Your Honor.  This was a hardship on me.

6    Most of the people that I'm in jail with are 20 and 30 years

7    old.  It's hard on them.

8              And I've said to Tom many times -- he's asked me,

9    "How are you doing?"

10             I say, "I'm okay."

11             I'm not willing to, you know, whine or complain,

12   but it's been a hardship.

13             And what he said is very true about my business.

14   I was going to put my business up for sale this year

15   basically to see what it was worth.  I was told what it was

16   worth by an accountant and a doctor, and I figured, okay,

17   let's just see what it's worth because I know -- I've seen

18   other people sell their pest control business, and I know

19   it's a long, drawn out affair, but now I can't even consider

20   doing that.

21             See, I was the only person really to service -- I

22   had one part-time guy that works for me on Saturdays, but I

23   did all the rest of the servicing.  That's 170 customers I

24   was doing myself every month.  But I've lost one-quarter to

25   one-third of them because of -- they didn't want the people

1    that I sent out.  They wanted me.  They were used to me, and

2    it's just been a very, very hard time for me.

3            But more than that, it's been a hard time for my

4    Linda.  A little over a year ago she lost her son in a very

5    mysterious, tragic way.  That same month her daughter gave

6    birth to a premature little girl who had issues.  Linda

7    stepped right up, stepped right in, and took care of that

8    baby.  And it was rough.  It's been a hard...

9            And then I had bond on Day 1, and I'm not going to

10   go into the details, but it can be explained.

11           So I wasn't prepared to do anything to set up my

12   business to make it more, you know, palatable and more of a

13   thing that can function.  She had to go out and do this.  So

14   she's doing all -- she's in grief of her son.  Her son and

15   her were very close.  She's helping her daughter basically

16   every day, and she's trying to run my business.  And for

17   that to continue, she's -- it's going to be a real hardship

18   on her.

19           I think Mr. Egan covered the rest of it pretty

20   well.

21           This never should have happened.  I was going down

22   as a patriotic citizen to celebrate, but I was -- I allowed

23   myself to be dragged into this mob mentality, and it turned

24   into that for different reasons that I'm not going to go

25   into because a lot of things were not right there at all.

1          So I'm just trying to look for some compassion and

2    mercy from the Court.  That's what I need, Your Honor.  I

3    just want to go back to my life.

4          THE COURT:  All right.  What I'm going to do is

5    take about a 15-minute break.  I want to go over what has

6    been discussed, and I'll come out and complete the

7    sentencing.  All right?

8          So it's now -- it's ten to 10:00, so at five after

9    11:00 I'll come back.  And Ms. Patterson will indicate when

10   I'm coming back, if it takes me a little longer, but I want

11   to consider what's been said in terms of looking over the

12   sentencing.  All right?

13         So parties are excused until then.

14         (Recess taken)

15         THE COURT:  All right.  In addition to the

16   advisory sentencing guidelines, the Court considers the

17   pleadings, arguments, videos, the record in this case, in

18   addition to the following information in determining a fair,

19   appropriate, and reasonable sentence in conformance with the

20   factors set out in 18 USC 3553(a) and subsequent sections

21   except (e).

22         Mr. Richardson is 72 years old.  In terms of

23   criminal history, he has no convictions.

24         There are pending charges at this point.  One case

25   involves charges of carrying a firearm without a license, a

1    misdemeanor, and driving without -- either a license

2    suspended or revoked.  He does have a pretrial hearing set

3    for September 20th in Pennsylvania.

4          The facts that are alleged -- and these are

5    allegations; they're not convictions -- which occurred on --

6    the charges at least were brought on October 20th of 2020,

7    that the defendant was stopped by police while driving with

8    a suspended license and registration, and, when asked, he

9    first denied and then subsequently affirmed that he had a

10   gun on his person.  He had no permit because his gun permit

11   had been revoked to carry a gun at an earlier occasion.

12   Evidently it had been revoked due to an incident at a gas

13   station where evidently he -- the allegation is that he

14   showed his -- that he had a gun, but -- when he lifted his

15   shirt.

16         He was not arrested for whatever this altercation

17   was, but he did lose his gun permit, so at the time that he

18   was stopped by the police he didn't have it.

19         The second one.  He's been charged with aggravated

20   assault causing serious bodily injury, extreme indifference,

21   which is a felony.

22         The rest appear to be misdemeanors; simple

23   assault, recklessly endangering another person, harassment,

24   and obstruction of the highways.  And this is alleged to

25   have occurred on October 25, 2021.  That also has a pretrial

1       hearing on September 20th of this year in Pennsylvania.

2       This relates to a video and some witnesses.

3               Again, it's allegations, not convictions,

4       relating to a motorcyclist coming down the street where

5       Mr. Richardson lived.  Mr. Richardson was in the middle of

6       the street, whatever his purpose was.  The motorcyclist

7       evidently did not stop, and Mr. -- it's alleged that

8       Mr. Richardson pushed him off -- pushed him, and at any rate

9       the motorcyclist evidently crashed into the defendant's

10      truck, went over the hood of the truck, was injured with

11      stitches in his eyebrows and surgery on his leg.  But,

12      again, these are charges, not crimes.

13              But I would note that the defendant was on release

14      in the one case when he committed the offense in this case,

15      and the other -- these cases also involve allegations of

16      weapons.

17              In terms of education, he's a high school

18      graduate.  He was drafted in 1969 into the military.  He was

19      sent to Vietnam for one year.  He was honorably discharged

20      in 1973, and he earned various awards while he was in the

21      military.

22              He's taken computer program courses after high

23      school.  He was evidently equipped as an analyst while he

24      was in the military.  He's also -- in the '70s took

25      corresponding courses in criminology and sociology.

1          In terms of job history, starting in 1977 he

2     started his own business, an exterminating service, which is

3     still an active business.  He evidently had planned on

4     retiring and potentially selling his business.  Financially

5     at this point he may need to reconsider that plan.

6          In terms of finances, he does have assets and

7     income.  The business income is down.  And -- but, however,

8     due to restitution and the likelihood that he's going to get

9     a jail sentence, I'll find there's no financial ability to

10    pay a fine based on those two circumstances.

11         In terms of substance abuse, there's no issues.

12         In terms of mental health and emotional, no issues

13    were flagged.  He is competent, and there's nothing that I

14    have seen or heard in terms of the proceedings both in front

15    of me as well as, frankly, the videos of interviews, et

16    cetera, and counsel has agreed that he is competent.

17    Defense counsel has asked for a mental health evaluation,

18    which I will order when he's released on supervised release.

19         I would note that in the FBI interview he was

20    asked as to whether he had any problems remembering dates or

21    memories, and he indicated he had no issues.

22         Physical condition.  There are no specific issues

23    that the Court needs to address.

24         On a personal basis, he was born into an intact

25    family.  He is one of six siblings.  Both parents are now

1    deceased.  His father was a chef; his mother a homemaker and

2    eventually was involved with later the restaurant business.

3           At this point he has only one surviving sibling, a

4    sister, who is retired and whom he has a very good

5    relationship with.

6           The defendant has been married two times.  He was

7    married in 1972; divorced in 1988.  He has three children.

8    One son is a police officer.  He has a daughter employed at

9    a reading establishment and another daughter at a

10   pharmaceutical company.  The son and one daughter are

11   married, have children; and one daughter is single.

12          He had a second marriage in 1990, and they were

13   divorced in 1992, and there are no children from that

14   marriage.

15          He's been living with Ms. Volpe, V-O-L-P-E.  She's

16   considered friends and business partners.  The defendant

17   does pay rent and lives in her home, and Ms. Volpe has

18   indicated that he can return to live there.

19          The letters in support of the defendant.

20   Generally they describe the defendant as a good businessman.

21   Customers from his exterminating service were very

22   complimentary.  Some have become friends.  Other friends and

23   family indicate he's a church-goer.  He, of course, is a

24   military veteran, so he has served his country, and he's

25   been supportive in various instances of friends and family

1        in his life.

2                In terms of the statement of the offense, what I'm

3        going to do is do two things.  I'm going to read the

4        statement of offense putting it in context, which is what

5        was discussed at his plea.  So I'm going to put it in

6        context of what was going on that day, January 6, 2021.

7                The U.S. Capitol, which is located at First

8        Street, Southeast, in D.C., is generally secured 24 hours a

9        day by the Capitol Police.  There were restrictions around

10       the Capitol which included permanent and temporary security

11       barriers.  Posts were manned by the U.S. Capitol Police,

12       later by other law enforcement officers, and only authorized

13       people with appropriate identification would be allowed

14       access inside the Capitol.  They would also go through a

15       security clearing.

16               On January 6, 2021, the exterior plaza of the

17       Capitol was closed to members of the public.  On that date,

18       a joint session of the U.S. Congress convened at the

19       Capitol, and during that joint session elected members of

20       the House of Representatives and the Senate were meeting in

21       separate chambers to certify the vote of the Electoral

22       College of the 2020 Presidential Election, which had taken

23       place on Tuesday, November 3, 2020.

24               The joint session began at approximately 1:00 p.m.

25       Shortly thereafter, by approximately 1:30, the House and

1    Senate adjourned to separate chambers to resolve a

2    particular objection.  Vice President Mike Pence was present

3    and presiding, first in the joint session and then in the

4    Senate Chamber.

5         As the proceedings continued in the House and

6    Senate and with Vice President Pence present and presiding

7    over the Senate, a large crowd gathered outside the Capitol.

8    Temporary and permanent barricades as noted above were in

9    place around the exterior of the Capitol, and Capitol Police

10   officers were present and attempting to keep the crowd away

11   from the Capitol and the proceedings underway inside.

12        At approximately 2:00 p.m., certain individuals in

13   the crowd forced their way through, over the barricades.

14   Officers of the Capitol Police were forced to retreat, and

15   the crowd advanced to the exterior facade of the building.

16   It was not lawfully authorized to enter or remain in the

17   building.  Prior to entering they would have had security

18   clearances, which did not happen.

19        At such time, the certification proceedings were

20   still underway.  The exterior doors and windows were blocked

21   and secured.  The Capitol Police attempted to maintain order

22   and to keep the crowd from entering.

23        Shortly after 2:00 individuals forced their way

24   into the Capitol, breaking windows, assaulting members of

25   law enforcement, as others in the crowd encouraged and

1    assisted in those acts.

2             The riot resulted in substantial damage to the

3    Capitol.  They've indicated in the -- that it's $1.4 million

4    for repairs.  It is actually now two-point-something

5    million.

6             Shortly thereafter, at approximately 2:20, members

7    of the House of Representatives and the Senate, including

8    the president of the Senate, which would be Vice President

9    Pence, were instructed to and did evacuate the chambers.  So

10   all proceedings of the Congress, including the joint

11   session, were effectively suspended until after 8:00 p.m. on

12   January 6th.

13             In light of the dangerous circumstances caused by

14   the unlawful entry, the congressional proceedings could not

15   resume until after every unauthorized occupant had been

16   removed, and the proceedings resumed at approximately 8:00

17   p.m.

18             Now, I'll give that as a background in terms of

19   what happened.  It is clear that Mr. Richardson did not

20   enter the Capitol itself.

21             In terms of his participation, Mr. Richardson

22   lives in King of Prussia, Pennsylvania.  On the morning of

23   January 6, 2021, he traveled from his home to Washington,

24   D.C., ostensibly to attend a rally in support of then-

25   President Trump and to protest Congress's certification of

1     the Electoral College.

2              He made his way to the restricted area of the U.S.

3     Capitol grounds.  He passed by metal barriers and police

4     officers attempting to keep the crowd away from the

5     building.

6              For several minutes he stood among the crowd and

7     waved a blue and white -- it appears -- although there's

8     some dispute about what the flag was, it appears that it was

9     a Trump flag.  He then made his way to the edge of the crowd

10    towards the U.S. Capitol Building and approached the line of

11    officers and a set of metal barricades.

12             At about 1:38, the defendant was standing several

13    feet away from the police line holding his flagpole.  So he

14    was in the front line.  There were barriers.  He then raised

15    the flagpole and forcefully swung it down to strike a police

16    officer standing behind the metal barricade.  The

17    defendant's flagpole made contact with the officer.

18    Defendant raised his flagpole again and forcefully swung it

19    down striking the officer for a second time.  Defendant

20    struck the officer a third time, but the force was enough to

21    break the flagpole.

22             Defendant retreated from the police line after

23    someone deployed pepper spray or tear gas, and he backed

24    away to shield his eyes.  It evidently was pepper spray.

25             He remained on the Capitol grounds until

1     approximately 3:10.

2              Now -- this is what he did sign, which is why I

3     went over it.

4              Now, at the plea we had a fairly extensive

5     discussion about the offense and the facts.  It was not a

6     straightforward agreement to what he had signed.  There were

7     certainly excuses, but only -- he ultimately agreed that he

8     had struck at the officer three times with the flagpole,

9     which is why the Court accepted the plea.

10             I've reviewed the transcript of the plea to go

11    back and review the back-and-forth that counsel -- not

12    counsel -- well, counsel to some degree, but the defendant

13    and I had.  He starts by describing this metal object, which

14    is the billboard, that others lifted.  The police -- he

15    claims he saw it coming his way.  He put his hand up to stop

16    it.

17             Now, if you look at the video -- and there's two

18    videos -- it clearly is Mr. Richardson pushing it towards

19    the police officers.  It's very obvious.  He could have

20    moved back and gone completely away from it.  He moves up

21    towards it.  He could have stayed back and not been anywhere

22    near it.

23             And he's on the side -- the second video shows

24    he's on the side definitely pushing it towards the barrier

25    where the police officers are, and evidently it does act

1     sort of like a battering ram.

2          He claims this happened before.  It did not happen

3     that way.  He had already hit the police officer with the

4     flagpole or done the three strikes, and so it was not before

5     as he had indicated at the plea.

6          Now, he was also interviewed by the FBI.  There's

7     both a video, which I've looked at, and also a transcript of

8     the proceedings.  In the interview, he claims that the

9     police officer that's at issue struck out at him first with

10    a baton.  The -- and he insisted on that, even after looking

11    at the video.

12         The video belies that.  The police officer did

13    have a baton.  There's no swinging out at him with the baton

14    at all.  And I looked at it a couple of times to make sure I

15    was looking at it correctly.  The defendant hit at the

16    police officer behind the barriers.  There are three quick

17    angry strikes.

18         Now, he was also -- and I thought this of

19    interest -- he was also asked his opinion by one of the FBI

20    agents, since his son is a police officer, that if someone

21    had struck his son, the police officer, with a flagpole like

22    the defendant did, you know, what was his -- what would his

23    reaction be or how would he view this?  And his comment is

24    he would not consider him a police officer if he was trying

25    to strike the defendant, and, as I said, the video doesn't

1    indicate that there was anything -- any action towards him.

2         And it's also obvious that the defendant keeps

3    engaging after these pepper sprays.  And it's not clear in

4    terms of the totality whether he got sprayed beforehand or

5    this was the second time, but certainly he got sprayed just

6    before he used the flag.  But that occurred because some

7    people in the crowd -- and he was in the front, although not

8    him -- had moved very close to the barriers and were sort of

9    involved at the barriers at the point that the pepper spray

10   was used by the police to sort of control the crowd.

11        So he's come up with excuses both at the plea and

12   in the interview.  Ultimately he, however, has agreed that

13   he struck at the police officer three times, and so I

14   accepted the plea.

15        So this is a serious offense.  I mean, the

16   defendant joined in a mob at the Capitol.  He's well aware

17   that he was not authorized to be on the Capitol grounds.  He

18   saw the barriers.  He saw police manning them.  He saw the

19   crowd move forward.  If you look at the photo of the media

20   tower in the area where the inaugural stage was, which is

21   where this occurred, the crowd is astounding in terms of its

22   numbers.  They took a photo from the top.  And this is the

23   area where the defendant was present and the incident

24   occurred.

25        And certainly maybe originally there wasn't a

1    large mob, but there certainly was a large mob at the point

2    of the events that we're talking about here.  The crowd was

3    getting unruly, climbing over the scaffolding, and the

4    defendant is sort of in the front of -- there's the crowd,

5    there's a space, and then you have the line of police

6    officers.  They're in riot gear behind these bicycle racks

7    that were serving as barriers, and from time to time the

8    crowd moves up to the police line, starts to push at the

9    barriers, and the defendant's in the front.

10          Now, he didn't do that.  I mean, he did not -- was

11   not involved in the incident in terms of what prompted the

12   police to use the pepper spray, which they used at that

13   point because the crowd had gotten too close and were

14   pushing at the barricade so it was used to push the crowd

15   back.

16          So you can see the defendant has a flag.  He

17   strikes out at an officer three times.  He may have hit the

18   first time the baton, but other times, frankly, it looks

19   like he hit his hand.  On the third strike, the flagpole

20   broke.

21          I would say that the officer is not claiming that

22   he was injured with these strikes from the defendant,

23   although there were a lot of various things that were going

24   on.  I've seen the video.  And, as I said, the officer did

25   not swing his baton before the defendant struck at the

1    officer.

2          But you can see that the defendant is very angry.

3    His face is very angry.  He's got both hands on the pole

4    holding the flag, and he uses force.  And you can see he

5    swings angrily, and his force breaks -- whether it's a

6    wooden or a metal pole, it's not clear.  And the intent has

7    to be to injure the officer.  There's no other reason to do

8    it because he's aiming at the officer and the barricade, and

9    there's no provocation by the officer.  I mean, I'm not

10   going to accept the idea that because they did pepper spray

11   him, which was appropriate under what was going on, that

12   that allows you to, you know, basically take the actions he

13   did.

14          There's also this other incident that occurs after

15   the flagpole incident.  Now, he described it as happening

16   beforehand, but that's not correct.  And there's a large

17   metal-edged billboard about eight feet by ten feet, and you

18   can see it in the videos.  The crowd is hoisting it up and

19   over towards the line of police officers, which would

20   certainly do a lot of damage, and the defendant is assisting

21   in pushing it towards the police.

22          The video doesn't support his version, that he's

23   pushing it away from it so as not to be injured.  He could

24   easily have walked -- pushed back himself.  He moves

25   forward, and he moves forward even to the side.  And this

1    billboard was used as a battering ram, and it did break the

2    police line.  And I will say that the defendant in the FBI

3    interview did acknowledge that the metal billboard was

4    dangerous.

5            At some point the defendant commented to the other

6    rioters that the police were not going to leave voluntarily

7    because the crowd was saying, you know -- asking the

8    officers they should just simply go away.  He comments that

9    they're not going to leave voluntarily, which encourages the

10   crowd to use force and to get past the police line.

11           Now, he arrives at the stage at around 1:00 p.m.,

12   and he left at about 3:10.  He did not go into the Capitol

13   building.  After the incidence with the flagpole and the

14   billboard, he evidently walks around, and there's a video

15   showing him doing that.

16           Although the defendant ultimately at the plea

17   hearing admitted his criminal assault, he certainly

18   equivocated to start with, and there was a lot of back-and-

19   forth between the Court.  And I do that because I'm not

20   going to accept a plea unless they -- no matter what they

21   sign -- unless they actually verbally agree to what he did,

22   and he ultimately did.

23           In the FBI interview after the plea he also agreed

24   he committed the criminal assault, but, again, as I

25   mentioned, he's trying to excuse his action and lessen his

1    culpability with another version that somehow the baton was

2    moving, and today he's talked about it was because of the

3    pepper spray.

4         So he's not truthful claiming the officer, you

5    know, waved his baton at him before he -- the defendant

6    struck, nor about his role with the billboard being used as

7    a battering ram.  The videos clearly show that that's not

8    the case.  So it's not like, you know, we have the

9    government's version and the defendant's version.  We have

10   videos that are very clear.

11        Frankly of concern as well to the Court are the

12   alleged incidents, and those are those two cases that are

13   pending.  They're pending charges.  They're not convictions,

14   but the nature of the allegations certainly raise concerns

15   on the part of the Court, and I believe he was on release in

16   one case when he committed this offense.  The other occurred

17   after this offense, but I believe before he was actually

18   arrested.

19        Now, I will commend him for his service as a

20   Vietnam veteran.  That was a very difficult and a very

21   unpopular war, and the fact that he served and spent a year

22   in Vietnam is certainly something to be commended, and I

23   salute him for that.  He also received honors.  But I would

24   note that when you're in the military, you swear to uphold

25   the Constitution.  That's one of the things that you do, and

1    clearly on January 6th he didn't uphold the Constitution.

2         Now, his son has been a police officer, evidently,

3    for 20 years.  The defendant agreed in the interview with

4    the FBI that the police can use actions like the use on

5    January 6th of pepper spray to control large and unruly

6    crowds and those that are becoming violent, but he seems to

7    have seen them differently insisting the officer, you know,

8    is the aggressor and not the defendant.  I would have

9    expected, frankly, that he be more appreciative of the

10   difficult role and position these police officers were in on

11   January 6th, outnumbered by a violent mob.

12        It also appears that he didn't initially admit to

13   pretrial that he'd been arrested, and they went through it a

14   couple of different ways to make sure that he understood it

15   wasn't convictions they were asking.  But he evidently

16   didn't bring up the two arrests he's had, or at least the

17   one arrest that he's had, so he's been engaged in some

18   obfuscation.  Certainly the actions involved are violent,

19   and frankly he's lied about what -- you know, what occurred

20   on that day, although he's ultimately admitted, you know,

21   the criminal assault.

22        I will add that there are some positive aspects

23   besides his service as a veteran.  He did plead guilty.  He

24   didn't go to trial, and so certainly in terms of -- the

25   resources of the government and the Court were saved because

1    of that.  And he did admit, which is why I gave him the

2    three points of acceptance of responsibility, that he did

3    commit the assault, and in the allocution today he's

4    indicated that he regrets what has happened.  To some

5    degree it's the consequences to him and his business and to

6    Ms. Volpe, but he now has discussed it not as a baton issue

7    but it's because he was angry based on the pepper spray; so

8    it's a slightly different version than we've had before.

9         But he's been a successful businessman, starting

10   his own business, and he's evidently built it up, a very

11   going concern with a sizeable amount of income, and

12   obviously his customers are very complimentary.

13        He has family support.  He has friends who both

14   were -- started as customers and became his friends, and

15   he's assumed roles in the community.

16        In his FBI interview he indicated he had served as

17   a poll watcher, a judge of elections and GOP precinct

18   committeemen.  So he certainly has, you know, made efforts

19   to participate in the community in these various roles,

20   which, you know, one would expect would ensure these roles;

21   that our country upholds its ideals as a democracy through

22   the free election process, and so the roles that he's had,

23   particularly poll watcher, judge of elections, all of these

24   things go to that.

25        I was struck by your role as a poll watcher.

1    There are poll watchers in every community, every city,

2    every county, and every town.  They're volunteers.  They

3    generally are passionate about their communities and their

4    country.  Even though the service may only be, you know,

5    once a year, the poll watcher position is one of the most

6    important, frankly, in our country, in my view.  They're the

7    lifeblood of the very essence of what it means to live in a

8    democratic society where voting is important, free

9    elections.  And in this instance he went from helping

10   members of his community exercise the most fundamental right

11   to vote necessary for a democracy to thrive to attacking the

12   ideals of a democracy by his criminal actions on January

13   6th.

14         The events of January 6th, which you participated

15   in, Mr. Richardson, was an insurrection.  It was not a

16   protest, and certainly not a peaceful one.  And the goal was

17   to stop the certification of a presidential election and

18   peaceful transfer of power as guaranteed by the

19   Constitution.  You may have expected a different outcome,

20   but the point is that you were there, and you participated

21   at a point so that there wouldn't be a peaceful transfer.

22         Your actions participating in the mob helped

23   create the momentum of violence by you and others in terms

24   of this mob mentality, and participating in the insurrection

25   provided safety for your violent actions and the violent

1   actions of others, and violence is an unacceptable way to

2   resolve political differences.

3          There are lawful means available in a democracy to

4   change or challenge actions you disagree with which do not

5   include a violent insurrection.  Your presence and actions

6   by joining other insurrectionists was an inexcusable attack

7   on our democracy and the peaceful transfer of power

8   according to the Constitution and a disrespect for the rule

9   of law, which governs civilized societies.  You should

10  appreciate what an extraordinary country you live in with a

11  vibrant democracy.  You should appreciate how lucky you are

12  to live in a democracy as opposed to some other country

13  ruled by an authoritarian.

14         In terms of parity, I've -- there are charts all

15  over the place about the different sentences.  I did --

16  there was a chart that I looked at which included sentences

17  of pleas that related to the charges that Mr. Richardson

18  pled to; so I pulled those out, not just pleas in general,

19  so all of them are of some assaultive behavior of some sort.

20         The majority of the sentences are at the top of

21  the guideline range, and in the 40-plus-month range as well

22  is the majority.  If you look at the low end and the high

23  end, the majority are in the 40 months plus.

24         Now, the sentence that I impose I hope will send a

25  message to you, to deter you and importantly others from

1    ever engaging in this type of destructive behavior in the

2    future and to admit and recognize you live in a country with

3    incomparable freedoms which are protected by the rule of

4    law.  You eliminate the rule of law, and you jeopardize

5    those freedoms.

6            Now, there are consequences to your actions, not

7    only to yourself.  There are some, you know, immediate

8    consequences, which was your business in terms of it not

9    thriving.  If you hadn't been involved in this action, you'd

10   still be doing your business, and you could potentially sell

11   it and be retiring at this point.  But that's not what you

12   did.

13           You also have unintended consequences for those

14   close to you, whether it's family or Ms. Volpe, which

15   you've talked about.  I mean, there's certainly consequences

16   to her in terms of her trying to do it, and it would be nice

17   if you -- I've said this to other defendants -- thought

18   about you actions before you take them to realize there are

19   consequences to what you do when you commit a criminal act,

20   and it may affect other people as they have in this

21   particular case.

22           Now, I know probation did recommend a variance,

23   and I always respect their opinions.  They're experienced in

24   these cases.  I will say that the videos that were provided

25   by the government and the transcripts, et cetera, were not

1    made available to her so she did not read them or look at

2    them.  I think I did.  Not I think I did, I know I did.  And

3    I think that if they had been reviewed, there might have

4    been a different recommendation because I've gone through

5    what was on those, which certainly factored into my decision

6    about a sentence so -- looking at the 3553(a) factors, just

7    punishment, deterrence to you and to others, and certainly

8    the sentence will reflect parity.

9              So pursuant to the Sentencing Reform Act of 1984

10   and in consideration of the provisions of 18 USC Section

11   3553 as well as advisory sentencing guidelines, it's the

12   judgment of the Court that you, Howard Charles Richardson,

13   are hereby committed to the custody of the Bureau of Prisons

14   for a term of 46 months on Count 2.  You're further

15   sentenced to serve a 36-month three-year term of supervised

16   release as to Count 2.  In addition, you're ordered to pay a

17   special assessment of $100 in accordance with 18 USC Section

18   3103.  I cannot waive that.  That needs to be paid at some

19   time.

20             While on supervision you shall abide by the

21   following mandatory conditions as well as the standard

22   conditions of supervision, which are imposed to establish

23   the basic expectations for your conduct while on

24   supervision.  The mandatory conditions include you must not

25   commit another federal, state, or local crime.  You must not

1    unlawfully possess a controlled substance.  The mandatory

2    drug testing condition I suspended in your case based on the

3    Court's determination that you pose a low risk of future

4    substance abuse.  You must cooperate in the collection of

5    DNA as directed by the probation office, and you must make

6    restitution in accordance with 18 USC Section 3663 and 3663A

7    or other statutes authorizing the restitution.

8           You shall comply with the following special

9    conditions.

10          The restitution obligation.  You must pay $500 a

11   month towards restitution starting 90 days after being

12   released on supervised release until it's fully paid.  I'll

13   give you a period of time after you're released to be able

14   to look at your finances.

15          I have not put anything in about the Bureau of

16   Prisons, their financial responsibility program.  It depends

17   on where he is sent, and based on COVID they've come and

18   gone in terms of the programs.  If you want to participate,

19   you can request it, and you can -- you -- basically what you

20   would do is work.  Some income you'd keep, and some would go

21   to the restitution.  The Bureau of Prisons will make a

22   decision if you decide you want to ask for it, or they may

23   require you to do it.  I don't have anything to do with the

24   requirements of what the Bureau of Prisons does.

25          I'll find that you don't have the ability to pay a

1    fine.  I waive imposition of a fine in this case.

2         You're ordered to make restitution to the

3    Architect of the Capitol in the amount of $2,000.  I've

4    determined that you don't have the ability to pay any

5    interest on that amount and, therefore, waive any interest

6    or penalties that may accrue on the balance.

7         Restitution payments shall be made to the Clerk of

8    the Court for the U.S. District Court in the District of

9    Columbia, and the disbursement is to the following victim:

10   Architect of the Capitol, Office of the Chief Financial

11   Officer, Attention Kathy Sherrill, S-H-E-R-R-I-L-L, CPA,

12   Ford House Office Building, Room H2-205B, Washington, D.C.

13   20515.  And the amount of loss it $2,000, which goes to the

14   $2-plus-million damages.

15        In terms of financial information disclosure, you

16   must provide the probation officer access to any requested

17   financial information and authorize the release of any

18   financial information.  The probation office may share

19   financial information with the U.S. Attorney's Office.

20   They'll be doing that until you pay off the restitution.

21        Financial restrictions.  You must not incur new

22   credit charges or open additional lines of credit without

23   the approval of the probation office.  And, again, this is

24   tied to your payments of restitution.

25        I am going to require a reentry progress hearing.

1    Within 45 days of release from jail, you'll appear before

2    the Court for a reentry progress report.  The U.S. Probation

3    Office in the district to which you're supervised -- and it

4    may be in Pennsylvania -- will submit a progress report to

5    the Court within 30 days of the commencement of supervision,

6    and when I get the progress report, then I'll determine if

7    your appearance is actually required.

8         I'm doing that to make sure that we go over the

9    conditions, address the issue of restitution, and any other

10   issues.

11        I will request that you have a mental health

12   evaluation while you're on supervised release.  You shall

13   participate in a mental health evaluation at the direction

14   of the probation office.

15        The Court finds that, as I've indicated, you do

16   not have to pay a fine, and I'm waiving that.  The other

17   financial obligations are immediately payable to the Clerk

18   of the Court, which would be both the restitution and the

19   $100 special assessment, although I've gone ahead and set a

20   schedule of payments.  Within 30 days of any change of

21   address, you'll notify the Clerk of the Court of the change

22   until such time as the financial obligation is paid in full.

23        The probation office shall release the presentence

24   investigation report to all appropriate agencies, which

25   includes the U.S. Probation Office in the approved district

1    of residence in order to execute the sentence of the Court.

2    Treatment agencies, if there are any, shall return the

3    presentence report to the probation office on the

4    defendant's completion or termination from treatment.

5            Notice of appeal.  Pursuant to 18 USC Section 3742

6    and the plea agreement, you have a right to appeal the

7    sentence imposed by the Court if the period of imprisonment

8    is longer than the statutory maximum, which it is not, or

9    departs upward, which it doesn't either.  But there were

10   other areas in terms of potentially doing it.  If there is a

11   basis for it and you do choose to appeal, you have to file

12   it within 14 days after the Court enters judgment.

13           As defined in 28 USC 2255, you also have the right

14   to challenge the conviction entered or sentence imposed if

15   new and currently unavailable information becomes available

16   to you or on a claim that you received ineffective

17   assistance of counsel in entering a plea of guilty to the

18   offense of conviction or in connection with the sentencing.

19   Again, if you're unable to afford the cost of an appeal, you

20   can request permission from the Court to file it, and you

21   can also request that counsel be appointed to represent you.

22           Now, pursuant to a D.C. Circuit opinion that was

23   handed down in 2016, the *Hunter* case, are there any

24   objections to the sentence imposed or anything else that

25   needs to be brought up that has not already been discussed?

1        I will indicate one other thing that will be part

2   of the sentence.  I'm recommending you receive credit for

3   time served, which they will give you, but the Bureau of

4   Prisons does it, from November 30, 2021, which is the period

5   of time that -- so that will reduce your sentence since the

6   time that you've been locked up.

7        Is there a recommendation as to -- and all I can

8   do is recommend -- as to where he wishes to be incarcerated?

9        MR. EGAN:  Judge, it would be as close as possible

10  to the Eastern District of Pennsylvania, please.

11       THE COURT:  Okay.  They usually do that.  I'll put

12  it in.  If you decide -- you can talk to probation, if you

13  wish.  They may have a better idea of what places are

14  nearby --

15       MR. EGAN:  Understood.

16       THE COURT:  -- in terms of doing it.  They don't

17  always pay attention to the recommendation, but I'll put

18  whatever it is that's in there.

19       MR. EGAN:  Thank you.

20       THE COURT:  Okay.  Anything else?  Government?

21       MS. ALLEN:  Yes, Your Honor.  I move to dismiss

22  Count 1 and then Counts 3 through 7 of the indictment.

23       THE COURT:  Okay.  And the greater offense in

24  Count 2, right?

25       MS. ALLEN:  That's right, Your Honor.  Thank you,

1    yes.

2                THE COURT:  Okay.

3                All right.  Anything else from you, Mr. Egan?

4                MR. EGAN:  No.  Thank you, Your Honor.

5                THE COURT:  All right.  I don't expect I should be

6    around.  I don't expect, Mr. Richardson, that I'm going to

7    see you back with any problems.  I'm hoping that you'll give

8    careful thought to what you have done and that you will

9    consider carefully in discussing with others so that you go

10   back to being the member -- the responsible member in your

11   community in terms of -- and use it as a lesson that this --

12   involving yourself in what you did on January 6th is not the

13   way our democracy works and encourage others not to think of

14   doing it.  All right?

15               The parties are excused.

16                    (Whereupon the hearing was

17                     concluded at 11:55 a.m.)

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 19th day of September, 2022.

9

10                                    /s/Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
11                                    United States Courthouse
                                      Room 6718
12                                    333 Constitution Avenue, NW
                                      Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25